T.C. Memo. 2004-110


UNITED STATES TAX COURT


RIGGS NATIONAL CORPORATION & SUBSIDIARIES,
f.k.a. RIGGS NATIONAL BANK AND SUBSIDIARIES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]


Docket No. 24368-89.                    Filed May 3, 2004.


Joel V. Williamson, Thomas C. Durham, Gary S. Colton, Jr.,
Russell R. Young, Charles W. Hall, and Stephen M. Feldhaus, for
petitioner.

Theodore J. Kletnick and Courtney L. Shepardson, for
respondent.

---

[*]This Supplemental Memorandum Findings of Fact and Opinion
supplements our Supplemental Memorandum Opinion in T.C. Memo.
2001-12, revd. and remanded 295 F.3d 16 (D.C. Cir. 2002), which
supplemented our Opinion in Riggs Natl. Corp. & Subs. v.
Commissioner, 107 T.C. 301 (1996), revd. and remanded 163 F.3d
1363 (D.C. Cir. 1999).

SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, Judge:  This case is before the Court on remand from the U.S. Court of Appeals for the District of Columbia Circuit for further consideration consistent with its opinion in Riggs Natl. Corp. & Subs. v. Commissioner, 295 F.3d 16 (D.C. Cir. 2002) (Riggs IV), revg. and remanding T.C. Memo. 2001-12 (Riggs III).

The sole issue to be decided on remand is whether, in computing petitioner's foreign tax credits under section 901[1] for 1984 and 1985, Brazilian income taxes withheld by Banco Central do Brasil (the Central Bank) must be reduced by the pecuniary benefit (equal to 40 percent of those withheld Brazilian income taxes) that the Central Bank received from 1984 through June 28, 1985.[2]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]We have previously held that, in computing a U.S. lender's foreign tax credit, Brazilian taxes withheld and paid on behalf of the lender must be reduced by the pecuniary benefit received by the Brazilian borrower.  Nissho Iwai Am. Corp. v. Commissioner, 89 T.C. 765 (1987); Norwest Corp. v. Commissioner, T.C. Memo. 1992-282, affd. 69 F.3d 1404 (8th Cir. 1995); First Chicago Corp. v. Commissioner, T.C. Memo. 1991-44; Continental Ill. Corp. v. Commissioner, T.C. Memo. 1988-318, affd. in part and revd. in part 998 F.2d 513 (7th Cir. 1993), affd. per curiam sub nom. Citizens & S. Corp. & Subs. v. Commissioner, 919 F.2d 1492 (11th Cir. 1990).  In the cited cases, unlike here, the withheld taxes were not paid, and the pecuniary benefit was not received, by a tax-immune Brazilian governmental entity such as the Central Bank.

FINDINGS OF FACT

We incorporate herein the findings of fact set forth in Riggs Natl. Corp. & Subs. v. Commissioner, 107 T.C. 301 (1996) (Riggs I), revd. and remanded 163 F.3d 1363 (D.C. Cir. 1999) (Riggs II), and Riggs III by this reference.  We also incorporate herein the stipulations and exhibits in Riggs I and Riggs III by this reference.  For ease of understanding, we repeat those facts set forth in Riggs I and Riggs III which we deem necessary to clarify the supplemental findings set forth herein and the ensuing opinion involving the issue for decision.

In Brazil, the Central Bank performed a number of governmental functions in conjunction with Banco do Brazil, including the unified management and operation of Brazil's monetary and financial system under what was known as the caixa unico system.[3]  From 1965 through 1986, Banco do Brazil had four primary functions:  (1)  A commercial bank, (2) a monetary authority, (3) management control and distribution of currency, and (4) responsibility for bank clearing.  Further, like the Central Bank, Banco do Brazil functioned as: (1) A lender of last resort to public-sector entities, (2) a development bank responsible for various subsidized credit programs of the Brazilian Government, and (3) a fiscal authority that managed the

---

[3]Until the Central Bank was formed in 1965, Banco do Brazil served as the country's sole monetary authority.

Brazilian Government's budget.  During the time relevant to this case, Banco do Brazil was owned 51 percent by the Brazilian Government and 49 percent by private shareholders.

During the years in issue, Banco do Brazil was the Brazilian National Treasury's agent for payment of taxes.  The Central Bank collected and paid over to Banco do Brazil, for the account of the National Treasury, withholding taxes, export taxes, taxes on financial operations, and social security taxes.

On its books, Banco do Brazil made entries reflecting the following:  (1) Transfers of Central Bank tax payments to Banco do Brazil's Banking Reserves Account at the Central Bank, (2) collections of Federal Government tax receipts, and (3) deposits of Federal Government revenues payable upon demand to the National Treasury.

Brazil imposed restrictions on the receipt and exchange of foreign currency.  Law No. 4,131 (enacted on September 3, 1962, and amended by Law No. 4,390 on August 29, 1964) established the basic rules for foreign investments in Brazil and the remittances of funds abroad with respect to such investments.  Law No. 4,131 regulated and set conditions for loans made to a person or entity residing or domiciled in Brazil by a person or entity residing or domiciled abroad.  By law, the Central Bank set the official exchange rates and registered and approved all loans from foreign lenders to Brazilian borrowers.  Through the registration

process, the Central Bank set the range of acceptable interest rates and periodically established the minimum repayment terms of loans. Once the Central Bank approved a loan, the foreign lender remitted the proceeds in foreign currency to the Brazilian borrower via a commercial bank in Brazil (the exchange bank). The exchange bank converted the foreign currency into Brazilian currency by means of an exchange contract, whereby the borrower sold the foreign currency to the exchange bank in exchange for Brazilian currency at the official exchange rate.

The Brazilian borrower received a Certificate of Registration that enabled the borrower to effect payment of interest and principal in the foreign currency in which the loan was made. Remittances abroad required the recording of each payment on a Certificate of Registration. The Certificate of Registration had to be presented to the Central Bank for approval. Before approving the payment of interest, the Central Bank would verify that the amount of the interest payment corresponded to the amount indicated on the Certificate of Registration for that loan and that all required tax payments had been made.

Brazilian law imposed a withholding tax on interest paid to foreign lenders and prohibited remittance of an interest payment to a foreign lender without proof of payment of the withholding tax. Certain Brazilian commercial banks were authorized to

collect the taxes so withheld (collecting banks).  A collecting bank was required to maintain an account for the Brazilian Revenue Service (BRS).  Taxes collected by the collecting bank were deposited into the account of the BRS.  Those amounts were then transferred to Banco do Brazil.

Under Brazilian law, the borrower initiated payment of the withholding tax by preparing four copies of a Documento de Arrecadacao de Receitas Federais (DARF).  The borrower submitted the DARFs, along with the tax payment, to a collecting bank.  The collecting bank retained one copy of the DARF, returned to the borrower two copies stamped to reflect the interest and tax payments, and sent one copy to the BRS along with the taxes it had collected.

The borrower paid the interest on the loans by purchasing foreign currency at the official exchange rate, by means of an exchange contract with the exchange bank handling the payment to the lender.  On each payment date, the borrower delivered a copy of the DARF and the Certificate of Registration to the exchange bank and instructed the bank to pay the interest.  The exchange bank then prepared an exchange contract that enabled the borrower to purchase foreign currency to be paid to the foreign lender. The exchange bank recorded the amount of interest and tax on the Certificate of Registration and then submitted the certificate, along with the exchange contract and the DARF, to the Central

Bank for approval. Upon approval by the Central Bank, the exchange bank tendered the foreign currency to the foreign lender and returned to the Brazilian borrower the Certificate of Registration (stamped to reflect the interest and tax payment), a stamped copy of the DARF, and a copy of the exchange contract.

Most often, the collecting bank and the exchange bank were one and the same. In that situation, the collection of the withholding tax and payment to the foreign lender were transacted simultaneously.

Many of the Brazilian companies that needed working capital were unable to provide foreign lenders with adequate financial information or proper guaranties to obtain a loan. As a result, the Central Bank issued Resolution 63, which permitted certain Brazilian banks (borrowing banks) to borrow funds from abroad for the specific purpose of re-lending (repassing) the corresponding borrowed funds in Brazilian currency to Brazilian companies (repass borrowers). The loan between the foreign lender and the borrowing bank (repass loan) was independent of the loan between the borrowing bank and the repass borrower. The foreign lender had no legal relationship with the repass borrower and normally did not know the repass borrower's identity.

Except for the term of the repass loan, Resolution 63 required all financial conditions between the borrowing bank and the repass borrower to be the same as those between the foreign

lender and the Brazilian bank.  The charges paid by a repass borrower to the borrowing bank were in the same proportion as the charges paid by the borrowing bank to the foreign lender.  If the interest rate charged by the foreign lender to the Brazilian bank was net of the Brazilian withholding tax, then the interest rate payable by the repass borrower was net of the Brazilian withholding tax.

Beginning in 1974, borrowing banks could deposit with the Central Bank Resolution 63 funds not used in repass operations.  When such funds were so deposited, the Central Bank paid the interest on the foreign loan; and if a net loan[4] was involved, no withholding tax was paid with respect to the Central Bank's interest payment.[5]

---

[4]In a net loan, the borrower contractually agrees to pay both the interest on the loan to the lender and any local (in this case, Brazilian) tax that the lender incurs as a result of the interest income.  Under Brazilian law, when the Brazilian borrower under a net loan assumes the burden of withholding tax, the amount of interest remitted is considered net of tax and an adjustment known as a "gross up" is required for purposes of computing the withholding tax.  This gross-up adjustment is computed as follows:

$$\text{grossed-up interest} = \frac{\text{net interest}}{1 - \text{withholding tax rate}}$$

[5]Art. 19 of the Brazilian Constitution prohibits the Brazilian Government, States, and municipalities from taxing the assets, income, and operations of public-sector entities, including autarquias, like the Central Bank.  The Brazilian Supreme Court held that public-sector entities were not required to pay withholding tax with respect to their net loan interest remittances abroad, because they assumed the tax burden in such

(continued...)

As a result of the historically high inflation in Brazil and the periodic currency devaluations, the National Monetary Council issued Resolution 432, which authorized borrowers of registered foreign currency loans to hedge cruzeiros (intended to be used for payments on the loans) against currency devaluations by depositing foreign funds at the borrower's Brazilian bank. Pursuant to Resolution 432, the borrower would purchase the funds to be deposited at its Brazilian bank at the official exchange rate. The foreign funds remained on deposit until such time as the borrower was required to make payment to the lender. The foreign currency deposited at the borrower's bank was then transferred to the Central Bank which paid (2 days before the date the borrower was required to make payment to the lender) interest on the deposited funds at a rate equal to that payable by the Brazilian borrower to the foreign lender (as set forth in the Certificate of Registration). To the extent that interest was paid to the foreign lender with funds deposited in the Central Bank, the Brazilian borrower had no obligation to withhold income taxes thereon.

------

[5](...continued)
cases and they were immune from taxation under the Brazilian Constitution. The Brazilian Revenue Service specifically authorized the Central Bank to waive the withholding of tax on remittances abroad made by the Central Bank and/or other public-sector entities that had assumed the tax burden (i.e., interest due on net loans).

If the 432 program loan was a gross loan, the Central Bank would pay the withholding tax due on the interest payable to the foreign lender during the period the funds were deposited in the Central Bank. If the 432 program loan was a net loan, the Central Bank would pay no withholding tax with respect to the interest payable to the foreign lender.

Some foreign lenders sought to have the Central Bank pay withholding tax and issue them DARFs with respect to the Central Bank's 432 loan program net loan interest remittances, as this would enable these foreign lenders to claim potential foreign tax credits.[6] Their efforts were unsuccessful, however, because the Central Bank (a tax-immune governmental entity) was not required to pay the withholding tax.

Decree-law 1,215, enacted May 4, 1972, gave the Brazilian Minister of Finance discretion to grant a reimbursement or reduction of, or exemption from, the withholding tax on interest. Decree-law 1,351, enacted on October 24, 1974, as amended by Decree-law 1,411, enacted July 31, 1975, authorized the National Monetary Council to (1) reduce the income tax on interest, commissions, and expenses remitted to persons resident or

---

[6]Although, in the case of a net loan, the U.S. lender had to pay U.S. income tax with respect to the additional interest income resulting from the gross-up, the lender would receive a foreign tax credit equal to the additional interest income that would reduce the lender's U.S. income tax liability dollar for dollar.

domiciled abroad or (2) grant pecuniary benefits to Brazilian borrowers receiving loans in foreign currency.

Pursuant to that authority, borrowers taking out foreign loans duly registered with the Central Bank were granted a pecuniary benefit equal to 85 percent of the tax paid on the interest, commissions, and expenses due on those loans.

Circular 266, issued by the Central Bank, set forth the regulations governing the procedure for payment of the pecuniary benefit:

(1) A DARF was to be used for the payment of the income tax on interest paid on foreign currency loans;

(2) on the date of payment of the tax, the collecting banking receiving the tax payment would, by means of a credit to the borrower's account, pay to the borrower the equivalent of 85 percent of the income tax;

(3) in the case of a Resolution 63 repass loan, on the date of payment the borrowing bank would be obligated to transfer the total value of the pecuniary benefit to the repass borrowers; and

(4) the collecting bank would debit the amount of the pecuniary benefit to an account of the collecting bank entitled "Pecuniary Benefit -- D.L. 1,411" (the pecuniary benefit account), and on the same day as the payment of the tax to Banco do Brazil the collecting bank would charge the pecuniary benefit account against Banco do Brazil.

The amount of the pecuniary benefit varied over the years. From May 8, 1980, to July 27, 1985, the pecuniary benefit was 40 percent of the withheld tax. On June 28, 1985, it was reduced to zero.

Brazil began experiencing problems in paying its foreign debt in 1982. Petitioner was one of hundreds of banks involved in the restructuring of Brazil's foreign debt. As part of this restructuring, the Central Bank served as the borrower under certain restructuring debt loans it entered into with Brazil's foreign lenders. The Brazilian Government guaranteed the Central Bank's obligations to the foreign lenders under these restructuring debt loans. All of these restructuring debt loans were net loans (i.e, the Central Bank and the foreign lenders agreed that all specified payments of principal and interest to the foreign lenders, under the loan contracts, would be made net of any applicable Brazilian taxes).

As relevant herein, the restructuring of Brazil's foreign debt was divided into three phases. The loans made to the Central Bank under phase I and phase II were net loans that had repayment terms of 7 to 9 years. In phase I and phase II, certain funds lent to the Central Bank were to be re-lent by the Central Bank to other Brazilian persons and companies. The phase I and phase II loans provided that there would be an initial

period of about 16 or 18 months during which funds could be re-lent to other Brazilian persons and companies (the re-lending period). Originally, the re-lending period was to end on June 30, 1985, but it was extended to March or April 1986.

On or about December 28, 1982, the head of the Central Bank's Department of Foreign Capital Fiscalization and Registration (FIRCE) submitted a "consulta" or ruling request to the BRS. FIRCE sought a ruling regarding the Central Bank's obligation to pay withholding taxes on interest paid on the restructuring loans and its right to the attendant subsidy/pecuniary benefit. In reviewing the ruling request, the BRS formulated a theory that the Central Bank was required to pay withholding tax on its restructuring debt interest remittances during the re-lending periods because, until the expiration of the applicable re-lending period, the loan funds were not irrevocably committed to the Central Bank, and it, therefore, had to pay withholding tax on behalf of future, unidentified "borrowers-to-be" (the borrowers-to-be theory). The BRS incorporated this borrowers-to-be theory into its draft ruling, which ultimately became the final version of the ruling the BRS issued to the Central Bank in March 1984.

By letter dated March 14, 1984, the Brazilian Finance Minister forwarded the ruling by the BRS and his decision on the ruling to the Central Bank's president.

The Finance Minister's decision stated:

Case No.: Interested Party:  CENTRAL BANK OF BRAZIL

DECISION:  I agree fully with the conclusions of the attached opinion of the * * * [BRS].  In view of item 13 of said opinion, I direct the Central Bank of Brazil to implement the payment of income tax on or before the last business day of the month following the month in which the withholding is made.

Brasilia, March 14, 1984
/Ernane Galveas/ ERNANE GALVEAS Minister of Finance

The BRS ruling, which he enclosed to the Central Bank,

stated:

Federal Government Service Ministry of Finance * * * [BRS]

OPINION

Income tax withheld on interest due to parties resident or domiciled abroad * * * [FIRCE] of the Central Bank of Brazil requests an opinion about the tax treatment of Agreements * * * under which such government agency (autarquia) is liable for the payments and remittances pertaining to them, in the period of availability of such funds for relending.

(2) By virtue of the special characteristics of these transactions, the question arises as to whether there is an incidence of income tax, in view of the government agency's (autarquia's) assumption of the burden, and if so whether,

   (a) the DARFs may be issued in the name of the agent bank centralizing each project, considering that the large number of lenders makes it impractical to complete one DARF for each of them;

   (b) the tax rates established in the treaties signed by Brazil to avoid double taxation may be applied;

   (c) the pecuniary benefit * * * applies;

(d) it is possible to establish another period for the payment of the tax, as from the date of remittance of the interest to the foreign lenders, because of the complex calculation of the interest and consequently of the tax itself;

(e) it is possible, in space 31 of the DARF, to indicate "Brazilian Financing Plan" as a reference, given the absence of a Certificate of Registration for these transactions;

(f) in the event that the income tax is paid late:

(f)(1) whether the Bank will nevertheless be entitled to the above-mentioned pecuniary benefit;

(f)(2) whether it would be possible to waive the monetary correction, delinquent interest and penalty.

(3) Interest received by individuals or legal entities, resident or domiciled abroad, from individuals or entities resident or domiciled in Brazil, or received from a permanent establishment located in Brazil, owned by individuals or legal entities resident or domiciled abroad, is subject to withholding tax at the rate of 25%, as provided for * * * [by law].  The contributor * * * of this tax is an individual or legal entity, resident or domiciled abroad, which has the legal availability of the interest.  Said tax must be withheld at the time of payment or credit by the interest paying source bearing in mind that the contributor * * * individual or legal entity, resident or domiciled abroad--does not file an income tax return in Brazil.  Said tax must be withheld even if the paying source is a legal entity of public law with tax immunity, because this is not a tax on the entity of public law that has immunity but rather on parties resident or domiciled abroad.

(4) It is obvious that, if the party resident or domiciled abroad, the interest creditor, is immune or exempt from this tax, on account of international treaty or domestic legislation, the tax should not be withheld.  In the case of the interest paid by the Central Bank * * *, there is an atypical situation.  * * * [The Central Bank] is a federal government agency (autarquia) responsible, among other duties, for

issuing currency, acting as depositary of the official gold and foreign currency reserves, providing for the placement of domestic and foreign loans, furthering the normal function of the exchange market, acting as a monetary policy instrument of the government and exercising control over credit in all its forms.

(5) The financial transactions conducted by * * * [the Central Bank] are, in general, conducted on behalf of the Federal Union or in its interest. In loan transactions, agreed upon with a net interest rate, the financial burden of the tax is transferred to the borrower. When the borrower assumes the tax burden, what actually happens is a gross-up of the income of the beneficiary lender. For this reason and in order to calculate the gross income obtained, the law determines that the basis of calculation of the tax--the amount of interest--be grossed up. In this way, the borrower pays the income tax to the Union on behalf of the lender, ensuring the net rate promised to the lender by means of the payment of a greater amount.

(6) Following the same reasoning, * * * it is possible to deduct, as an expense of a legal entity, the amount of tax incident on income tax paid to third parties, when the legal entity contractually assumes the burden as it is a supplemental expense and not a withholding tax.

(7) Now, when * * * [the Central Bank] acts on behalf of the interest of the Federal Union, in cases of transactions agreed upon with net interest rates, it could claim a reimbursement for the amount paid in the form of income tax. In reality, * * * [the Central Bank] would pay the tax to the Federal Union and the Federal Union could return it to * * * [the Central Bank]. Under this scenario, the payment of tax, as it would be a simple accounting transaction, could be waived.

(8) It should be noted that, as regards the possibility mentioned-- loans of funds which must be relent to borrowers in Brazil--said Bank must, in substitution of the future not yet identified debtors of the tax, pay the income tax on the interest paid during the period in which the funds remained available for relending. The fact is that, since the loan benefits persons which have not yet been identified from whom the payment of

withholding tax is stipulated law, * * * [the Central Bank] must in practice perform these acts on behalf of such persons.

(9) Considering, therefore, the peculiarity of the relationship * * * the Central Bank/Federal Union and the Central Bank/Final borrowers of the relent funds, I believe that, as regards the funds that must be released to those as yet unidentified borrowers in Brazil, * * * [the Central Bank] must as a substitute for such borrowers pay the income tax incident on the interest from January 1, 1984 to the end of the period of availability for such funds to be relent.

(10) On account of the foregoing, there are the following consequences to the transactions in question:

   (a) payment of withholding tax is due and the calculation base should be adjusted * * * [i.e., grossed up];

   (b) as there are innumerable lenders and income is received through an agent bank which will then distribute it, the DARF may be issued in the name of the agent to simplify the payment;

   (c) if there is a Convention to avoid double income taxation signed with countries in which beneficiaries are domiciled, the rates established in the conventions shall be applied to that portion of the income corresponding to each;

   (d) once the tax has been made, the pecuniary benefit established in * * * Decree-law No. 1351/74 is applicable, with the wording given by * * * Decree-law No. 1411/75;

   (e) in completing the DARF, the code to be used is code 0393 and, as no Certificate of Registration is issued in these transactions, "Brazilian Financing Plan" may be indicated in the appropriate space, as the reference to the certificate is merely a control requirement.

(11) As regards the delay in paying the tax not withheld, if the taxable event occurs while the inquiry is pending, the tax must be paid with monetary correction and without penalties * * *.

(12) As the term for payment of the tax is suspended, as far as the taxable events occurring while the inquiry is pending are concerned, as a consequence, the pecuniary benefit will be applicable in relation to the tax paid by the thirtieth day from the date of knowledge of the decision.

(13) As far as the extension of the tax payment period is concerned, this matter falls under the authority of the Minister of Finance * * *.

For higher consideration.
Brasilia, /Eivany Antonio da Silva/ Assistant Secretary of * * * [the BRS]

I agree with the above Opinion, which I approve. For the consideration of the Minister of Finance. Brasilia, /Luiz Romero Patury Accioly/ Acting Secretary of * * * [the BRS]

The ruling issued to the Central Bank was a private ruling that was given limited circulation.[7]

Beginning in 1984, the Central Bank issued DARFs to the agent banks of the foreign lenders to whom it transmitted loan payments, reflecting its withholding tax payments on restructuring debt interest remittances during the re-lending periods of the loans. From 1984 through 1988 the Central Bank issued a total of 324 DARFs to these agent banks. The Central Bank did not issue a separate DARF to each foreign lender specifying the withholding tax that had been paid by the Central Bank on each foreign lender's behalf on the interest remittance. Rather, each DARF covered the collective withholding tax the

---

[7]The ruling was not made available to the public and was not published in the Brazilian Government's Official Gazette.

Central Bank had paid on behalf of an entire group of foreign lenders subject to a particular withholding tax rate (i.e., a 12.5-percent withholding tax rate, a 15-percent withholding tax rate, or a 25-percent withholding tax rate).

The Central Bank sent to Morgan Bank (which served as the agent bank of foreign lenders that included petitioner) group DARFs reporting the aggregate withholding tax the Central Bank had paid on behalf of that group of lenders. The Central Bank enclosed with the DARFs supporting schedules setting forth with respect to each foreign lender: (1) The net interest remitted, (2) the grossed-up interest; (3) the withholding tax imposed, (4) the 40-percent pecuniary benefit the Central Bank received, and (5) the "60-percent balance of actual withholding tax paid". Notwithstanding that on June 28, 1985, the pecuniary benefit had been reduced to zero, the Central Bank continued to report to the foreign lenders that it received a pecuniary benefit equal to 40 percent of the withholding tax imposed on its post-June 28, 1985, interest remittances to them.

The supporting schedules reported that the Central Bank withheld and paid Brazilian income taxes of $166,415 for 1984 and $181,272 for 1985 in connection with debt interest remittances to petitioner. The supporting schedules reported that the Central Bank received pecuniary benefits of $66,566 for 1984 and $72,509

for 1985 before June 1985 with respect to those interest remittances.

On its 1980 through 1986 income tax returns, petitioner generally reported its interest income and withholding tax payments with respect to its Brazilian loans on a cash basis. Petitioner claimed a foreign tax credit and reported grossed-up interest income. On its returns covering the period from 1980 through June 28, 1985, petitioner reduced the amount of foreign tax credit it claimed in connection with its Brazilian loans by an amount equal to the pecuniary benefit provided by the Brazilian Government to Brazilian borrowers.

In its amended petition, petitioner asserted, among other things, that the foreign tax credit for Brazilian taxes withheld by the Central Bank otherwise allowable to it for 1980 through 1986 should not be reduced by the pecuniary benefit provided to Brazilian borrowers.

OPINION

As relevant here, sections 901(b) and 903 permit a domestic corporation to receive a tax credit in the amount of any income tax, or any tax paid in lieu of a tax on income, that is paid or accrued during the taxable year to a foreign country. A foreign levy is a tax if it requires a compulsory payment pursuant to the authority of a foreign country to levy taxes. Sec. 1.901-2(a)(2)(i), Income Tax Regs. Credit is not allowed,

however, for an amount of tax paid by a taxpayer to a foreign country that is used, directly or indirectly, by the foreign country to provide a subsidy by any means to the taxpayer.  Sec. 1.901-2(e)(3), Income Tax Regs.[8]

The purpose of the foreign tax credit is to protect against the double taxation of foreign income.  United States v. Goodyear Tire & Rubber Co., 493 U.S. 132, 139 (1989); Am. Chicle Co. v. United States, 316 U.S. 450, 451 (1942).  As an exemption from tax, the credit provisions of section 901 are to be strictly construed.  Inland Steel Co. v. United States, 230 Ct. Cl. 314, 677 F.2d 72, 79 (1982); Bank of Am. Natl. Trust & Sav. Association v. United States, 61 T.C. 752, 762 (1974), affd. without published opinion 538 F.2d 334 (9th Cir. 1976).

In Riggs I, we determined that the Central Bank was not required, under Brazilian law, to pay withholding tax on its interest remittances to petitioner and that the withholding tax paid by the Central Bank was a noncompulsory payment, rather than a tax.  Thus, we concluded that petitioner was not "legally liable" for the Central Bank's withholding tax payments and held

---

[8]The position set forth in the regulation regarding subsidies has been codified in sec. 901(i), which is effective for foreign taxes paid or accrued in taxable years beginning after Dec. 31, 1986.  Tax Reform Act of 1986, Pub. L. 99-514, sec. 1204(a), 100 Stat. 2532; Nissho Iwai Am. Corp. v. Commissioner, 89 T.C. at 777 n.17.

that the withholding tax payments were not creditable to petitioner.

On appeal, in Riggs II, the U.S. Court of Appeals for District of Columbia Circuit concluded that petitioner was legally liable for the withholding tax payments made by the Central Bank because the March 1984 ruling constituted an order by the Finance Minister, treated as an act of state, that the Central Bank pay the withholding taxes.  Riggs II, 163 F.3d at 1365-1369.  The Court of Appeals remanded the case to us to determine, among other things:  (1) Whether the Central Bank in fact paid withholding taxes on petitioner's behalf; and if so, (2) whether, in determining petitioner's creditable amount, the Brazilian withholding tax paid by the Central Bank must be reduced by the amount of any pecuniary benefit that the Central Bank may have received.  Id. at 1369.

In Riggs III, we determined that petitioner had failed to establish that the withholding taxes were paid by the Central Bank as required under section 905(b).  We questioned the reliability of the schedules accompanying the DARFs and found inexplicable the Central Bank's reporting that it had received a pecuniary benefit after June 28, 1985, the date on which the pecuniary benefit was eliminated.  Consequently, we held that petitioner was not entitled to any credit for taxes purportedly withheld by the Central Bank.

On appeal, in Riggs IV, the Court of Appeals concluded that the Brazilian taxes were withheld and paid by the Central Bank. The Court of Appeals explained that the DARFs issued by the Central Bank constituted official tax receipts of the Brazilian Government and were entitled to a presumption of regularity. It reasoned that respondent had failed to rely on clear and specific evidence necessary to rebut this presumption of regularity attaching to the DARFs. The Court of Appeals remanded the case to us to decide whether, in determining petitioner's creditable amount under section 901, the withheld taxes paid by the Central Bank should be reduced by any pecuniary benefit received by the Central Bank. Riggs IV, 295 F.3d at 22.

We begin the task assigned to us in Riggs IV by reviewing section 1.901-2, Income Tax Regs., which provides detailed interpretations of the foreign tax credit provisions. Paragraphs (a), (b), and (c) of section 1.901-2, Income Tax Regs., define an income tax for purposes of section 901; paragraph (e) "contains rules for determining the amount of tax paid by a person"; and paragraph (f) "contains rules for determining by whom foreign tax is paid." Sec. 1.901-2(a)(1), Income Tax Regs.

As effective for, and applicable to, 1984 and 1985, section 1.901-2(e)(3), Income Tax Regs.,[9] provides the following rules for determining the amount of tax paid by a person:

(e) Amount of income tax that is creditable.--

* * * * * * *

(3) Subsidies.--(i) General rule. An amount is not an amount of income tax paid by a taxpayer to a foreign country to the extent that-

(A) The amount is used, directly or indirectly, by the country to provide a subsidy by any means (such as through a refund or credit) to the taxpayer; and

(B) The subsidy is determined, directly or indirectly, by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the taxpayer;

(ii) Indirect subsidies. A foreign country is considered to provide a subsidy to a taxpayer if the country provides a subsidy to another person that-

(A) Owns or controls, directly or indirectly, the taxpayer or is owned or controlled, directly or indirectly, by the taxpayer or by the same persons that own or control, directly or indirectly, the taxpayer, or

(B) Engages in a transaction with the taxpayer, but only if the subsidy received by such other person is determined, directly or indirectly, by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the taxpayer with respect to such transaction.

---

[9]For earlier years an identical provision was found in sec. 4.901-2(f)(3)(ii)(B), Temporary Income Tax Regs., 45 Fed. Reg. 75647 (Nov. 17, 1980). Although amended regulations under sec. 901(i) were issued in 1991, those regulations are not effective for, or applicable to, petitioner's 1984 and 1985 taxable years.

(iii) Example.  The provisions of this paragraph (e)(3) may be illustrated by the following example:

Example.  Country X imposes a 30-percent tax on interest received by non-resident lenders from borrowers who are residents of country X, and it is established that this tax is a tax in lieu of an income tax within the meaning of § 1.903-1(a).  Country X remits to resident borrowers an incentive payment for engaging in foreign loans, which payment is an amount equal to 20 percent of the interest paid to non-resident lenders.  Because the incentive payment is based on such interest, it is determined by reference to the base used to compute the tax in lieu of an income tax that is imposed on the nonresident lender.  Under paragraph (e)(3)(ii)(B) of this section, the incentive payment is considered a subsidy provided indirectly to the nonresident lender since it is provided to a person (the borrower) that engaged in a business transaction with the lender and is based on the amount of tax in lieu of an income tax that is imposed on the lender with respect to the transaction.  Therefore, two-thirds (20 percent/30 percent) of the amount withheld by a resident borrower from interest payments to a non-resident lender is not tax in lieu of an income tax that is paid by the lender under paragraph (e)(3)(i) of this section and § 1.903-1(a).

The regulation deems the taxpayer to have been subsidized if the country provides a subsidy to a person with whom the taxpayer engages in a business transaction, provided the subsidy is determined directly or indirectly by reference to the amount of income tax, or to the base used to compute the income tax, imposed by the country on the taxpayer with respect to the transaction.  The existence of an indirect subsidy does not depend upon a finding that the U.S. taxpayer derived an actual economic benefit; it is sufficient that another person who engages in a transaction with the U.S. taxpayer has received a

subsidy that was based on the amount of tax paid. Norwest Corp. v. Commissioner, 69 F.3d 1404, 1409-1410 (8th Cir. 1995), affg. T.C. Memo. 1992-282; Continental Ill. Corp. v. Commissioner, 998 F.2d 513, 519-520 (7th Cir. 1993), affg. in part and revg. in part on another ground T.C. Memo. 1988-318; Riggs I, 107 T.C. at 362. This Court, the U.S. Court of Appeals for the Eighth Circuit, and the U.S. Court of Appeals for the Seventh Circuit have held that the regulation is valid and applies to the Brazilian subsidy at issue here. Norwest Corp. v. Commissioner, supra at 1408-1410; Continental Ill. Corp. v. Commissioner, supra at 519-520; Nissho Iwai Am. Corp. v. Commissioner, 89 T.C. 765, 775-777 (1987). Brazil provides the subsidy to a Brazilian borrower who engages in a business transaction (the loan) with the U.S. taxpayer lender. The subsidy provided to the Brazilian borrower is 40 percent of the tax imposed by Brazil on the U.S. lender's Brazilian income (the interest paid on the loan), and thus, the subsidy is measured by that tax.

In Nissho Iwai Am. Corp. v. Commissioner, supra at 777, we stated:

> payment of the tax and receipt of the subsidy are in lockstep. Commonsense dictates that payment of the tax and receipt of the subsidy be viewed together in determining the amount of foreign taxes creditable for purposes of section 901. If we accept payment of the Brazilian tax as one transaction and receipt of the subsidy as another, we would ignore the true unity of the transaction and elevate form over substance; this we shall not do.

In Riggs IV, 295 F.3d at 22, the Court of Appeals stated: "As we understand the Brazilian tax system, a borrower paid the entire amount of interest owed on a foreign debt and then later received a credit equal to the amount of the pecuniary benefit. Such a system necessitates two separate and independent transactions."

With due respect, we wish to clarify that the Brazilian borrower paid the withholding tax and simultaneously received the pecuniary benefit before paying the interest to the foreign lender. The Brazilian borrower paid the interest by purchasing foreign currency at the official exchange rate by means of an exchange contract with the exchange bank handling the payment of the interest to the lender. The borrower could not pay the interest without a copy of the DARF evidencing the payment of withheld tax. On each payment date, the borrower delivered a copy of the DARF and the Certificate of Registration to the exchange bank. The exchange bank then prepared an exchange contract that enabled the borrower to purchase foreign currency to be paid to the foreign lender. The exchange bank recorded the amount of interest and tax on the Certificate of Registration and submitted the certificate, along with the exchange contract and DARF, to the Central Bank for approval. Before approving the payment of interest, the Central Bank would verify that the amount of the interest payment corresponded to the amount

indicated on the Certificate of Registration for that loan and verify that any required tax payments had been made. Upon approval by the Central Bank, the exchange bank tendered the foreign currency to the foreign lender and returned to the Brazilian borrower the Certificate of Registration (stamped to reflect the interest and tax payments), a stamped copy of the DARF, and a copy of the exchange contract. Thus, the borrower was required to pay the withholding tax before the interest owed on a foreign debt could be paid.

At the time of payment of the withholding tax, the Brazilian borrower automatically and immediately received a credit from the tax collecting bank in the amount of the subsidy.

> Mechanically, the tax-collecting bank credited the account of the National Treasury for the entire tax due and simultaneously debited (reduced) the account of the National Treasury for the amount of the subsidy. The effect of this accounting procedure was that the National Treasury was credited only with the amount by which the withholding tax exceeded the subsidy.

Nissho Iwai Am. Corp. v. Commissioner, supra at 770.

As explained by the U.S. Court of Appeals for the Eighth Circuit in Norwest Corp. v. Commissioner, supra at 1409-1410:

> The regulation reasonably views the payment of the local tax and the receipt of the pecuniary benefit or subsidy together in order to determine the amount of foreign taxes creditable for purposes of 26 U.S.C. § 901. See Nissho, 89 T.C. at 777, (viewing payment of tax and receipt of subsidy as "in lockstep"). This interpretation is also consistent with the intent of Congress to reduce international double taxation. * * * [The taxpayer] can claim a foreign tax credit for the amount of Brazilian taxes it paid, that is * * * the

amount of the local tax reduced by the pecuniary
benefit or subsidy.  * * * [The taxpayer] is not
subject to double taxation because the pecuniary
benefit or subsidy was not paid to the Brazilian
government.  This is because the pecuniary benefit or
subsidy operated as a rebate * * * of the local tax, in
effect reducing the tax rate * * *.  See Continental,
998 F.2d at 519.

*    *    *    *    *    *    *

The reduction in the local tax rate constituted an
indirect subsidy within the plain language of the
regulation:  it is provided to the Brazilian borrower
that engaged in a business transaction with the
taxpayer and is calculated as a specific percentage of
the tax imposed on the payment to the taxpayer.

In Riggs I, we held that (1) the withholding taxes that non-tax-immune Brazilian borrowers had paid from 1980 through 1986 on their net loan interest remittances to petitioner were creditable to petitioner, Riggs I, 107 T.C. at 338-340, and (2) in determining petitioner's creditable taxes, the withholding taxes had to be reduced by the pecuniary benefit that the non-tax-immune Brazilian borrowers received, id. at 361-363; see also Norwest Corp. v. Commissioner, supra at 1407-1410; Continental Ill. Corp. v. Commissioner, supra at 519-520; Nissho Iwai Am. Corp. v. Commissioner, supra at 775-777.  Petitioner did not appeal the latter holding.

The courts have applied the subsidy provisions of section 1.901-2(e)(3), Income Tax Regs., to repass loans.  In such cases, "when the primary borrower made the interest payment to the foreign lender, it received the subsidy which it was required to

pass along to the repass borrowers by Brazilian law." Norwest
Corp. v. Commissioner, 69 F.3d at 1410. Those repass loans "fell
within the letter as well as the spirit of the subsidy
regulation." Continental Illinois Corp. v. Commissioner, 998
F.2d at 520; see also Norwest Corp. v. Commissioner, supra at
1410.

As a threshold matter, petitioner maintains that this Court
should find that the Central Bank did not receive any pecuniary
benefit from 1984 through September 28, 1985. According to
petitioner, in Riggs I, this Court found that the record does not
contain any evidence that the Central Bank received a pecuniary
benefit with respect to the tax that it withheld for interest
remittance to Riggs. Petitioner further argues that: (1) There
has been no new evidence submitted that would contradict this
Court's prior finding, (2) the Court of Appeals did not reach,
and thus did not reverse, this Court's factual finding that the
pecuniary benefit had not been paid, (3) the Court of Appeals
made no finding as to whether the pecuniary benefit actually had
been paid to the Central Bank, and (4) if there was no pecuniary
benefit paid to the Central Bank, there can be no subsidy.
Petitioner concludes that, unless this Court decides to reverse
its prior finding, petitioner is entitled to the full amount of
the foreign tax credit claimed.

Petitioner points to Riggs I, 107 T.C. at 335, where we said: "We are unable to ascertain * * * whether the Central Bank received the pecuniary benefit based on those withholding tax payments." This sentence, however, is taken out of context; it does not represent a prior factual finding of this Court that the Central Bank from 1984 through September 28, 1985, received no pecuniary benefit. The paragraph in our Riggs I findings containing this sentence reads:

> On the record presented in this case it is impossible to determine what entries were made on the respective books of the Central Bank and the National Treasury to reflect the Central Bank's payment of withholding tax on the restructuring debt interest remittances. We are unable to ascertain what, if any, entries were made to determine: (1) Whether the Central Bank was reimbursed by the National Treasury for its withholding tax payments; or (2) whether the Central Bank received the pecuniary benefit based on those withholding tax payments. The Central Bank's ruling request raised these two matters, and the March 1984 Brazilian IRS ruling discussed the two possibilities. [Id.; fn. ref. omitted.]

See also id. at 323 n.13, 361 n.47, 363. A virtually identical paragraph appears in our Riggs III findings.

Contrary to petitioner's argument, in Riggs I and Riggs III we did not expressly find that the Central Bank did not receive a pecuniary benefit with respect to those Brazilian taxes it withheld and paid from 1984 through June 28, 1985. In Riggs I and Riggs III, we did not reach, and did not have to decide, the issue of whether the pecuniary benefit the Central Bank reportedly received with respect to those Brazilian taxes must

reduce petitioner's foreign tax credits for those Brazilian taxes. Indeed, in Riggs I, 107 T.C. at 363, we stated: "we need not reach the issue of whether any pecuniary benefit the Central Bank received represents an indirect subsidy for purposes of section 1.901-2(e)(3)(ii), Income Tax Regs."; we made a similar statement in Riggs III.

Petitioner bears the burden of proof. On the basis of the record herein, we conclude that petitioner has failed to establish that the Central Bank during 1984 and 1985 did not in fact receive a pecuniary benefit.

Until June 28, 1985, the pecuniary benefit provided to Brazilian borrowers with foreign loans had been equal to 40 percent of the withheld Brazilian tax on their foreign loan interest remittances. The March 1984 ruling specifically provided that the pecuniary benefit applied to taxes withheld by the Central Bank on behalf of the borrowers-to-be, and the schedules attached to the DARFs issued by the Central Bank reported that the Central Bank received a 40-percent pecuniary benefit with respect to those Brazilian taxes withheld and paid by the Central Bank from 1984 through June 28, 1985.[10] Since the

---

[10]In Riggs III, we gave no weight to the schedules because they reported that the Central Bank continued to receive a pecuniary benefit equal to 40 percent of the withholding tax imposed on post-June 28, 1985, interest remittances. In Riggs IV, 295 F.3d at 20-22, the Court of Appeals opined that, at best, the schedules reflected clerical errors; at worst, they reflected
(continued...)

DARFs, the official tax receipts, report only the aggregate amount of tax paid for all lenders, it is the schedules accompanying the DARFs upon which petitioner relies to establish its portion of the withheld taxes, i.e., the amount of withholding tax the Central Bank paid on interest remitted to petitioner, $166,415 for 1984 and $181,272 for 1985, for which it is seeking the foreign tax credit. The schedules established, and consequently we find, that the Central Bank received pecuniary benefits of $66,566 for 1984 and $72,509 for 1985.

Petitioner alternatively maintains that Amoco Corp. v. Commissioner, 138 F.3d 1139 (7th Cir. 1998), affg. T.C. Memo. 1996-159, controls and is dispositive of the issue to be herein resolved. Petitioner contends that the Central Bank is to be considered part of the Brazilian Government. Petitioner asserts that the transaction between petitioner and the Central Bank complies with section 1.901-2(f)(2)(ii), Example (3), Income Tax Regs., and is specifically exempted from the subsidy rules of section 1.901-2(e)(3), Income Tax Regs. Accordingly, petitioner posits that its 1984 and 1985 foreign tax credits for the

_____

[10](...continued)
the receipt of an erroneous pecuniary benefit after June 28, 1985. Since the parties have reached an agreement as to petitioner's foreign tax credit for amounts withheld after June 28, 1985, we need not decide whether the Central Bank made a clerical error or received an erroneous pecuniary benefit for that period. We have no reason to question the accuracy of the schedules with respect to the amount of the pecuniary benefit received by the Central Bank on or before June 28, 1984.

withholding taxes paid by the Central Bank should not be reduced by the pecuniary benefit received by the Central Bank.

Respondent on the other hand contends that Amoco was wrongly decided and should not be followed in this case. Specifically, respondent argues that in Amoco this Court and the U.S. Court of Appeals for the Seventh Circuit misapplied section 1.901-2(f)(2)(ii), Example (3), Income Tax Regs., to exempt the transaction involving a corporation owned by the Egyptian Government and the U.S. taxpayer from the subsidy rules of section 1.901-2(e)(3), Income Tax Regs.

Alternatively, respondent argues that this case is distinguishable from Amoco. Respondent suggests that, consistent with the borrowers-to-be theory used in the Brazilian Finance Minister's March 1984 ruling, the borrowers-to-be (on whose behalf the ruling concluded the Central Bank must act in paying the withholding tax), and not the Central Bank, were the recipients of the pecuniary benefit the Central Bank received. And respondent concludes such borrowers-to-be are private parties who cannot be considered part of the Brazilian Government.

Because we agree that the facts in this case are distinguishable from those in Amoco, it is not necessary for us to reconsider the holding in that case.

Petitioner argues that the pecuniary benefit at issue here was provided by the Brazilian Government to its own

instrumentality, the Central Bank, and, thus, in accordance with Amoco and section 1.901-2(f)(2)(ii), Example (3), Income Tax Regs., the foreign tax credit should not be reduced.

Paragraph (f) of section 1.901-2, Income Tax Regs., "contains rules for determining by whom foreign tax is paid." Sec. 1.901-2(a)(1), Income Tax Regs.  Section 1.901-2(f), Income Tax Regs., provides in pertinent part:

> (f) Taxpayer--(1) In general.  The person by whom tax is considered paid for purposes of sections 901 and 903 is the person on whom foreign law imposes legal liability for such tax, even if another person (e.g., a withholding agent) remits such tax.  * * *
>
> (2) Party undertaking tax obligation as part of transaction--(i) In general.  Tax is considered paid by the taxpayer even if another party to a direct or indirect transaction with the taxpayer agrees, as a part of the transaction, to assume the taxpayer's foreign tax liability.  The rules of the foregoing sentence apply notwithstanding anything to the contrary in paragraph (e)(3) of this section.  See § 1.901-2A for additional rules regarding dual capacity taxpayers.[11]
>
> (ii) Examples.  The provisions of paragraphs (f)(1) and (f)(2)(i) of this section may be illustrated by the following examples:
>
> Example (1).  Under a loan agreement between A, a resident of country X, and B, a United States person, A

---

[11]A "dual capacity taxpayer" is a person who is subject to a levy of a foreign state and who also, directly or indirectly, receives a specific economic benefit from the state or an instrumentality of the state.  Sec. 1.901-2(a)(2)(ii)(A), Income Tax Regs.  Specific economic benefits are economic benefits that foreign governments do not make available on substantially the same terms to substantially all persons subject to the generally imposed income tax, e.g., a concession to extract government-owned petroleum.  Sec. 1.901-2(a)(2)(ii)(B), Income Tax Regs.

agrees to pay B a certain amount of interest net of any tax that country X may impose on B with respect to its interest income. Country X imposes a 10 percent tax on the gross amount of interest income received by nonresidents of country X from sources in country X, and it is established that this tax is a tax in lieu of an income tax within the meaning of § 1.903-1(a). Under the law of country X this tax is imposed on the nonresident recipient, and any resident of country X that pays such interest to a nonresident is required to withhold and pay over to country X 10 percent of the amount of such interest, which is applied to offset the recipient's liability for the tax. Because legal liability for the tax is imposed on the recipient of such interest income, B is the taxpayer with respect to the country X tax imposed on B's interest income from B's loan to A. Accordingly, B's interest income for federal income tax purposes includes the amount of country X tax that is imposed on B with respect to such interest income and that is paid on B's behalf by A pursuant to the loan agreement, and, under paragraph (f)(2)(i) of this section, such tax is considered for purposes of section 903 to be paid by B.

Example (2). The facts are the same as in example (1), except that in collecting and receiving the interest B is acting as a nominee for, or agent of, C, who is a United States person. Because C (not B) is the beneficial owner of the interest, legal liability for the tax is imposed on C, not B (C's nominee or agent). Thus, C is the taxpayer with respect to the country X tax imposed on C's interest income from C's loan to A. Accordingly, C's interest income for federal income tax purposes includes the amount of country X tax that is imposed on C with respect to such interest income and that is paid on C's behalf by A pursuant to the loan agreement. Under paragraph (f)(2)(i) of this section, such tax is considered for purposes of section 903 to be paid by C. No such tax is considered paid by B.

Example (3). Country X imposes a tax called the "country X income tax." A, a United States person engaged in construction activities in country X, is subject to that tax. Country X has contracted with A for A to construct a naval base. A is a dual capacity taxpayer (as defined in paragraph (a)(2)(ii)(A) of this section) and, in accordance with paragraphs (a)(1) and

(c)(1) of § 1.901-2A, A has established that the country X income tax as applied to dual capacity persons and the country X income tax as applied to persons other than dual capacity persons together constitute a single levy. A has also established that that levy is an income tax within the meaning of paragraph (a)(1) of this section. Pursuant to the terms of the contract, country X has agreed to assume any country X tax liability that A may incur with respect to A's income from that contract. For federal income tax purposes, A's income from that contract includes the amount of tax liability that is imposed by country X on A with respect to its income from the contract and that is assumed by country X; and for purposes of section 901 the amount of such tax liability assumed by country X is considered to be paid by A. By reason of paragraph (f)(2)(i) of this section, country X is not considered to provide a subsidy, within the meaning of paragraph (e)(3) of this section, to A.

Section 1.901-2(g)(2), Income Tax Regs., defines the term "foreign country" as "any foreign state, any possession of the United States, and any political subdivision of any foreign state or of any possession of the United States."

In Amoco Corp. v. Commissioner, T.C. Memo. 1996-159, an affiliate of Amoco Corp. (Amoco Egypt) entered into an arrangement with the Egyptian General Petroleum Corp. (EGPC). Under the agreement, EGPC assumed and paid tax Amoco owed to the Egyptian Government on its income. EGPC erroneously claimed a credit against its Egyptian income taxes for the tax paid on Amoco Egypt's behalf. The expiration of the limitations period barred the Egyptian Government from recovering the tax erroneously claimed as a credit by EGPC. The Commissioner asserted that the tax credit claimed by EGPC was an indirect

subsidy to Amoco Egypt that reduced the amount of Amoco Egypt's creditable foreign tax payments.

This Court held, and the U.S. Court of Appeals for the Seventh Circuit agreed, that Amoco Egypt's foreign tax credit was not to be reduced by EGPC's tax credit, because the transaction between Amoco Egypt and EGPC complied with the terms of section 1.901-2(f)(2)(ii), Example (3), Income Tax Regs., and, thus, was specifically exempted from the subsidy rules of section 1.901-2(e)(3), Income Tax Regs. In reaching this holding, we concluded that, for purposes of applying section 1.901-2(f)(2)(ii), Example (3), and (g)(2), Income Tax Regs., EGPC was to be considered part of the Egyptian Government, notwithstanding that EGPC was a separate legal entity under Egyptian law.[12]

The fact that a governmental instrumentality may be treated as part of the government with respect to certain matters does not necessarily mean that the instrumentality will be treated as such in all circumstances. Compare Lebron v. Natl. R.R. Passenger Corp., 513 U.S. 374 (1995), where the Supreme Court held that the National Railroad Passenger Corporation, commonly

---

[12]In affirming our decision, the U.S. Court of Appeals for the Seventh Circuit specifically focused on "the twin facts that EGPC is an instrumentality of the Egyptian government (though not "the country" itself) and that it was the sole entity that received the benefit of the (erroneous) tax credit." Amoco v. Commissioner, 138 F.3d 1139, 1148 (7th Cir. 1998), affg. T.C. Memo. 1996-159. The Court of Appeals found it "clear that any benefit to EGPC is a benefit to the government of Egypt, and vice versa". Id.

known as Amtrak, was part of the Government for purposes of the First Amendment to the U.S. Constitution, with Hrubec v. Natl. R.R. Passenger Corp., 49 F.3d 1269 (7th Cir. 1995), where the Court of Appeals held that employees of Amtrak are not "employees of the United States" for purposes of punishing unauthorized disclosures of an individual's income tax return under section 7431. Generally, an instrumentality may be treated as part of the government in circumstances where the instrumentality acts as an agent on behalf of the sovereign. Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 847 (D.C. Cir. 2000).

In this case, although the Central Bank frequently acts on behalf of the Brazilian Government, the Finance Minister's ruling indicates that, with respect to withholding taxes, there is "an atypical situation" when interest is paid by the Central Bank because the Central Bank is:

> a federal government agency (autarquia) responsible, among other duties, for issuing currency, acting as depositary of the official gold and foreign currency reserves, providing for the placement of domestic and foreign loans, furthering the normal function of the exchange market, acting as a monetary policy instrument of the government and exercising control over credit in all its forms.

The ruling recognizes that, although financial transactions conducted by the Central Bank generally are conducted on behalf of the Brazilian Government or in its interest, some transactions are conducted by the Central Bank on behalf of private individuals. Furthermore, the ruling makes clear that the

Central Bank's obligation to withhold taxes is determined by the person upon whose behalf the Central Bank is conducting the transaction. Specifically, when the Central Bank acts on behalf of the interest of the Brazilian Government, it could claim a reimbursement for the amount paid. In reality, the Central Bank would pay the tax to the Brazilian Government and the Brazilian Government could return it to the Central Bank. The ruling concludes that, under that scenario, the payment of tax would be a simple accounting transaction and could be waived. The ruling notes, however, that, with respect to loans of funds that were to be re-lent, the Central Bank was required to:

> in substitution of the future not yet identified debtors of the tax, pay the income tax on the interest paid during the period in which the funds remained available for relending. The fact is that, since the loan benefits persons which have not yet been identified from whom the payment of withholding tax is stipulated law, * * * [the Central Bank] must in practice perform these acts on behalf of such persons.
>
> (9) Considering, therefore, the peculiarity of the relationship * * * the Central Bank/Federal Union and the Central Bank/Final borrowers of the relent funds, I believe that, as regards the funds that must be released to those as yet unidentified borrowers in Brazil, * * * [the Central Bank] must as a substitute for such borrowers pay the income tax incident on the interest from January 1, 1984 to the end of the period of availability for such funds to be relent. [Emphasis supplied.]

The Finance Minister's ruling makes clear that when the Central Bank paid the withholding taxes, it was not acting on

behalf of the Brazilian Government, but rather it was acting on behalf of the borrowers-to-be.

As pointed out by the U.S. Court of Appeals for the District of Columbia Circuit in Riggs II, 163 F.3d at 1366:

> The Minister deemed it appropriate to "look through" the Central Bank to those ultimate private borrowers--so-called "borrowers-to-be"-- for purposes of deciding the proper tax treatment of the loans. * * * The Minister concluded that the "borrowers-to-be" aspect of the loans compelled an analogy to the garden variety private borrower situation * * *.  [Emphasis supplied.]

The Court of Appeals further stated: "The Minister's order to the Central Bank to withhold and pay the income tax on the interest paid to the Bank goes beyond a mere interpretation of law. * * * Such an order has been treated as an act of state."  Id. at 1367.

With respect to the pecuniary benefit, the Finance Minister's ruling holds that once the tax has been paid, the pecuniary benefit is applicable in accordance with Brazilian law. Under Brazilian law, borrowers were granted a pecuniary benefit equal to a percentage of the withholding tax paid on the interest due on net loans.  In the case of repass loans, where the borrower is a bank but the funds are re-lent to Brazilian persons, the borrowing bank collects the tax from the repass borrowers and is obligated to transfer the total value of the pecuniary benefit to those repass borrowers.  The Finance Minister's ruling treats the Central Bank as a borrowing bank in a repass loan transaction.  The Central Bank must pay the

withholding tax on behalf of the borrowers-to-be, and we believe it receives the pecuniary benefit on behalf of the borrowers-to-be. Otherwise, if the receipt of the pecuniary benefit is separated from the payment of tax, and the Central Bank is entitled to receive the pecuniary benefit from the Brazilian Government on behalf of the Brazilian Government, the Central Bank could return it to the Brazilian Government. Thus, under the rationale of the Finance Minister's ruling, the payment of the pecuniary benefit would be "a simple accounting transaction" and "could be waived."

Having concluded that the Central Bank did not receive the pecuniary benefit as an agent of the Brazilian Government, but rather on behalf of the borrowers-to-be, a finding of a subsidy would not mean that the Brazil was subsidizing itself. Under the facts of this case, we believe that it is proper to treat the Central Bank as separate from the Brazilian Government and therefore as "another person" for purposes of determining the existence of a subsidy.

Since the Central Bank was acting on behalf of the borrowers-to-be, rather than the Brazilian Government, the instant case is closer to Example (1), than to Example (3), of section 1.901-2(f)(2)(ii), Income Tax Regs. Both the payment of the withholding tax and the Central Bank's receipt of the subsidy were inextricably linked to the transaction between petitioner

and the Central Bank. Hence, the provisions of section 1.901-2(e)(3), Income Tax Regs., are applicable to the loans, and the subsidies paid to the Central Bank on behalf of the borrowers-to-be reduce petitioner's foreign tax credit. To conclude, we hold that petitioner's potential foreign tax credits for 1984 and 1985 for Brazilian taxes withheld by the Central Bank are to be reduced by the pecuniary benefit the Central Bank received with respect to those Brazilian taxes; i.e., petitioner is entitled to a foreign tax credit of $99,849 ($166,415 - $66,566) for 1984 and $108,763 ($181,272 - $72,509) for 1985 with respect to the Brazilian withholding taxes.

To reflect the foregoing and concessions by the parties,

<u>Decision will be entered under Rule 155.</u>