# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 14, 2006　　　　Decided August 24, 2007

No. 06-1034

PNC FINANCIAL SERVICES GROUP, INC., *D/B/A* RIGGS
NATIONAL BANK, AND SUBSIDIARIES,
APPELLANT

v.

COMMISSIONER OF INTERNAL REVENUE SERVICE,
APPELLEE

Appeal from the United States Tax Court
(No. IRS-24368-89)

*Thomas C. Durham* argued the cause for appellant. With him on the briefs were *Joel V. Williamson* and *Russell R. Young*.

*Frank P. Cihlar*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief was *Bridget M. Rowan*, Attorney.

Before: ROGERS, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

Dissenting opinion filed by *Circuit Judge* GRIFFITH.

BROWN, *Circuit Judge*: In prior litigation, PNC Financial successfully claimed a foreign tax credit for taxes paid on its behalf in Brazil. That credit, the Internal Revenue Service argues, must be reduced by the amount of an indirect subsidy PNC received from the Brazilian government. The Tax Court agreed, and we now affirm.

I

In an international tax case as complicated, economically and litigiously, as this one, we do well to start with the basics. When a U.S. bank makes a loan abroad, the interest income is susceptible to tax in both the United States and the foreign state. Congress avoids double-taxing international business by giving a credit for taxes paid to the foreign government, less any credit, refund, or subsidy given the taxpayer by the foreign government. I.R.C. § 901; Treas. Reg. § 1.901-2(e). Interest income of $100,000, for example, where the relevant tax rate in the U.S. was 50% and in the foreign country was 25% with a 10% refund, would work out to $15,000 to the foreign country and $35,000 to the IRS. Were the foreign rate 50% with no refund, $50,000 would flow to that country and nothing to the IRS. Thus the two countries are on a see-saw: When one country's tax revenue goes up, the other's goes down.

This case, or rather this iteration of this case (for it is the third time we have heard an appeal from the Tax Court concerning the same transaction), is a peculiar elaboration of these simple principles.[1] During the 1970s and early 1980s, in an

---

[1] The previous iterations of this case are, in order: *Riggs Nat'l Corp. & Subsidiaries v. Comm'r*, 107 T.C. 301, 1996 U.S. Tax Ct. LEXIS 49 (*Riggs I*); *Riggs Nat'l Corp. & Subsidiaries v. Comm'r*, 163 F.3d 1363 (D.C. Cir. 1999) (*Riggs II*); *Riggs Nat'l Corp. & Subsidiaries v. Comm'r*, 81 T.C.M. (CCH) 1023, 2001 Tax Ct. Memo

effort to increase its reserves of foreign currency, Brazil's government borrowed and (using tax breaks) encouraged its people to borrow substantial amounts from foreign lenders. In 1982, fiscal crisis led nearly to default on the loans, and Brazil embarked on a debt restructuring plan with an international consortium of banks. According to the plan, Brazil's government-controlled Central Bank stepped in as common debtor for the foreign banks, becoming a middleman on the old loans (paying the creditors what was owed to them from the original borrowers and in turn receiving payments from the original borrowers) and, since Brazil still needed foreign credit to function, borrowing billions of dollars in additional funds. Appellant PNC Financial Services Group, Inc. (formerly Riggs National Corporation and Subsidiaries) lent a portion of those additional funds. In 1984 and 1985, Brazil taxed PNC's interest income at a 25% rate, which came to $166,415 in 1984 and $181,272 in 1985. But a provision of Brazilian law, hanging on from happier economic days when the Brazilian government incentivized borrowing from foreign lenders, gave subsidies for these taxes worth 40% of the total—$66,566 in 1984, and $72,509 in 1985. This appeal is about the U.S. tax treatment of that $139,075 in subsidies. At first glance, it seems obvious enough that PNC should receive a credit of $166,415 less $66,566 toward its 1984 U.S. income tax, and $181,272 less $72,509 toward its 1985 U.S. income tax. But three factors complicate the picture.

---

LEXIS 20 (*Riggs III*); *Riggs Nat'l Corp. & Subsidiaries v. Comm'r*, 295 F.3d 16 (D.C. Cir. 2002) (*Riggs IV*); *Riggs Nat'l Corp. & Subsidiaries v. Comm'r*, 87 T.C.M. (CCH) 1276, 2004 Tax Ct. Memo LEXIS 110 (*Riggs V*). PNC Financial Services Group, Inc., merged with Riggs National Corporation and Subsidiaries and replaced its name in 2005—else this case would be *Riggs VI*. For convenience, we will refer to appellant as PNC even when speaking of the *Riggs I* through *V* period.

First, PNC's loans to the Central Bank were "net," not "gross." *Riggs II* gives a matchless explanation of the difference, which we will not belabor here. Suffice it to say that in a gross loan agreement, the lender pays local (Brazilian) taxes on his interest income (or the borrower withholds it), while in a net loan, the borrower "contractually agrees not only to pay interest to the lender, but also to pay any local (Brazilian) tax that the lender owes on that interest income." *Riggs II*, 163 F.3d at 1364. This is not necessarily a boon to lenders, for all else being equal, lenders must compensate borrowers for paying lenders' taxes with lowered interest rates. "The real difference between gross loans and net loans," *Riggs II* explains, "lies not in who licks the stamp on the envelope to the Brazilian government, but in who bears the economic burden of the tax." *Id.* With a net loan, the borrower bears that burden, for the borrower faces the risk of change in local tax rates, while the lender's net income (the interest payments) is stable. With a gross loan, the lender suffers the loss or reaps the benefit of change; it is his net income that might vary with taxes. Either way, however, the foreign government imposes legal liability for the local tax on the lender, and so either way the IRS credits the foreign tax payments. Treas. Reg. § 1.901-2(f).[2]

---

[2] Working out the numbers in any particular example gets complicated. Ever since *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716, 729 (1929), U.S. tax law has held that paying taxes on behalf of another person constitutes income to that person: If an employer, for example, promised to pay an employee $100,000 net, where the tax rate is a flat 50%, the IRS would view the employee as receiving more than $100,000 in income. It would view him, in fact, as receiving $200,000 in income, since 50% of $200,000 is $100,000 (a natural mistake is to regard the employee as receiving $150,000—the $100,000 in salary plus 50%); the employer would pay $100,000 to the employee and another $100,000 to the IRS on the employee's behalf. In other words, one must generate a notional income figure to calculate the tax owed where one party pays on

5

Second, the Central Bank is, as *Riggs II* put it, "no ordinary Brazilian borrower." 163 F.3d at 1366. Created by law to implement Brazil's monetary and fiscal policies (including issuing currency), required to act on behalf of Brazil's government and prohibited from acting on behalf of anyone else, able to contract in the name of the National Treasury, responsible for managing foreign lending to Brazilian borrowers, and under the control of the Minister of Finance, the Central Bank is 100% a part of Brazil's federal government, as all parties agree. The Federal Constitution of Brazil makes the Central Bank immune from tax on its own income, and in fact until 1988 the Central Bank operated, along with the National Treasury and the Banco de Brasil (in which Brazil's government held a controlling share), a centralized system for funding Brazil's government that jointly controlled Brazil's tax revenue (although it was the Banco de Brasil that actually held the government's tax revenue in its coffers). Thus, if it were legally possible for the Brazilian government to impose a tax on its Central Bank, it is not clear how it would be economically possible for the Central Bank to pay it: At most, the money would go from the Brazilian government's right pocket to its left. And so when the Central Bank takes out net loans from a U.S. lender, certain questions arise: Will Brazilian law, in keeping with the principle that tax

---

another's behalf—whether in the United States or in Brazil, where the procedure is called "grossing-up." Thus, if a U.S. lender contracts for $100,000 in interest income on a net loan, with a 20% foreign tax and a 50% U.S. tax, the Brazilian government would construe the lender's income to be $125,000 (the amount which, less 20%, would be $100,000) and charge $25,000 in taxes (with the borrower remitting that $25,000). The IRS would also construe the income as $125,000 and levy a 50%, $62,500 tax, minus a $25,000 foreign tax credit, which comes to $37,500 in U.S. taxes. Having paid that amount from its $100,000 in actual interest income, the U.S. lender is left with $62,500—which makes sense, being 50% of the lender's notional income without the dual complications of a net loan and a foreign tax.

payments incidental to net loans are payments on behalf of lenders, require the Central Bank to pay despite the Bank's constitutional immunity from taxes? If so, should the IRS credit those payments? If the Brazilian government refunds a portion of them to the Central Bank, should the IRS subtract some of the refund from the credit?

We must pause at this point to understand PNC's and the Central Bank's (or rather, Brazil's) interests on the eve of their lending arrangement. Only if the Central Bank was subjected to compulsory tax payments on PNC's behalf could PNC qualify for the § 901 credit. *See Riggs II*, 163 F.3d at 1365–66. And such payments would represent no economic burden for Brazil even if the Central Bank actually moved cash from its (government-controlled) vaults to the Banco de Brasil's (government-controlled) vaults. *See id.* at 1369. So both PNC and Brazil had an interest in seeing the Central Bank subjected to the compulsory payments. For PNC, every cent thus paid to the Brazilian government was money PNC would not have to pay to the IRS,[3] and for Brazil, the "tax" just meant, so far as we can tell, more credit at a lower interest rate. The only loser in the arrangement was the IRS, which, economically speaking, would simply have transferred wealth to Brazil for Brazil and PNC to split. *See id.* The IRS ends up on the wrong end of the see-saw.

Only the Central Bank's constitutional immunity from taxes stood in the way, and the third complexity in this case concerns

---

[3] As footnote two discusses, those payments from the Central Bank to the Brazilian government would also swell PNC's income in the IRS's eyes, which of course means higher U.S. taxes. But the value of the credit would exceed the detriment of the larger income—and always would, so long as the U.S. tax rate was below 100%.

how that immunity was overcome. Given their interest in the foreign tax credit, PNC and other banks went to Brazil's highest ranking authority on tax matters, the Minister of Finance, to request definitive guidance on whether the Central Bank would be subjected to the compulsory tax payments on their behalf. The most natural way for the Minister to answer "Yes" would have been to hold the Central Bank's tax immunity inapplicable in net loan arrangements, since the tax-immune entity pays standing in the lender's shoes. But this way was closed: Brazilian law already had authority for the opposite proposition. *Id.* at 1366. Another way, however, was open, for the money PNC loaned the Central Bank was available and officially intended for re-lending to private borrowers in Brazil. If the Central Bank could not stand in for the private lenders, perhaps it could stand in for these private borrowers. The Minister issued a private letter ruling, not available to the public but binding on the parties under Brazilian law, which *Riggs II* describes:

> The Minister deemed it appropriate to "look through" the Central Bank to those ultimate private borrowers—so-called "borrowers-to-be"—for purposes of deciding the proper tax treatment of the loans. And it was settled Brazilian law that a private borrower in a net loan was required to pay the tax obligation it had contractually assumed from the lender. The Minister concluded that the "borrowers-to-be" aspect of the loans compelled an analogy to the garden variety private borrower situation, and that the Central Bank must "as a substitute for such borrowers [to-be] pay the income tax incident on the interest . . . ."

*Id.* (first alteration in original). This reasoning further complicates the IRS's § 901 question. If the Brazilian Revenue Service looks through the Central Bank's tax-immune status because the

Central Bank stands in for borrowers-to-be, should the IRS follow suit in granting credits and subtracting subsidies? Should it matter that, in the event, none of the money ever was re-loaned?

As a statutory matter, these questions shape up as interpretations of I.R.C. § 901 and associated portions of the 1984 and 1985 Tax Code and regulations. In *Riggs I*, the issue was whether to permit the foreign tax credit at all, and it turned on whether the Central Bank's tax payments were compulsory, as the Minister had ruled, or voluntary. The Tax Court, viewing the Minister's private letter ruling as nothing more than "perhaps an administrative advisory opinion," conducted its own analysis of Brazilian law, concluded that the payments were voluntary, and denied PNC the credit. 1996 U.S. Tax Ct. LEXIS 49, at \*119. We reversed in *Riggs II*. As we saw it, the Tax Court had sat in judgment on and effectively declared invalid the Minister's order to the Central Bank to pay taxes—a foreign sovereign's official act within its own territory. The act of state doctrine shields such acts from American courts' review. 163 F.3d at 1367–68. We remanded "so that the Tax Court may determine in the first instance . . . whether the taxes were in fact paid by the Central Bank, and whether Riggs' credits must be reduced by the amount of any subsidies that the Central Bank may have received." *Id.* at 1369.

*Riggs III* and *IV* resolved the first of those two questions. In *Riggs III*, citing accounting irregularities, the Tax Court held that PNC "failed to establish that the withholding taxes in issue were paid by the Central Bank on petitioner's behalf." 2001 Tax Ct. Memo LEXIS 20, at \*66. Since PNC was (again) ineligible for the credit, the Tax Court did not reach the subsidies issue. But in *Riggs IV*, we reversed. PNC had submitted official Brazilian receipts stating that the tax had been paid. These receipts were entitled to the common law's "presumption of

regularity" for "the official acts of public officers," and while this presumption was rebuttable, the accounting irregularities that moved the Tax Court weren't the sort of "clear or specific evidence" needed to rebut it. *Riggs IV*, 295 F.3d at 21 (internal quotation marks omitted). There could no longer be any question that PNC was entitled to a foreign tax credit. *Riggs IV* remanded "to determine whether the tax credits should be reduced by any subsidies that may have been paid to the Central Bank." *Id.* at 23.

*Riggs V* takes up this last issue. In 1984 and 1985, recall, Brazil had a subsidies system (sometimes called a "pecuniary benefits" system in this litigation) that effectively returned 40% of any tax payment Brazilian borrowers in international net loans made on their foreign lenders' behalf. Mechanically, the two halves of the transaction—making the tax payments and receiving the subsidy—were "simultaneous[]," both occurring "before paying the interest to the foreign lender" and in such a way as to credit Brazil's national treasury "'only with the amount by which the withholding tax exceeded the subsidy.'" *Riggs V*, 2004 Tax Ct. Memo LEXIS 110, at *34–36 (quoting *Nissho Iwai Am. Corp. v. Comm'r*, 89 T.C. 765, 770, 1987 U.S. Tax Ct. LEXIS 142, at *11). In the Tax Court, no one doubted that this arrangement would have amounted to an indirect subsidy and properly reduced PNC's foreign tax credit had the borrower been a private party; past litigation in what have come to be called "the Brazilian tax cases," *Amoco Corp. v. Comm'r*, 138 F.3d 1139, 1145 (7th Cir. 1998), laid that question to rest. *See Norwest Corp. v. Comm'r*, 69 F.3d 1404, 1407–10 (8th Cir. 1995) (finding an indirect subsidy to the extent that the Brazilian government rebated a portion of the taxes Brazilian borrowers paid on U.S. lenders' behalf); *Cont'l Ill. Corp. v. Comm'r*, 998 F.2d 513, 519–20 (7th Cir. 1993) (same); *First Chi. Corp. v. Comm'r*, 61 T.C.M. (CCH) 1774, 1991 Tax Ct. Memo LEXIS 63, at *18–19, *21 (same); *Nissho Iwai*, 1987 U.S. Tax Ct.

LEXIS 142, at *24, *27 (same). What makes this case unique is the presence of and role played by the Central Bank standing in for private borrowers. The financial identity between the Central Bank and the Brazilian government, the same thing that had made it puzzling to think of the Central Bank making compulsory tax payments, also makes it puzzling to think of the Central Bank receiving governmental subsidies. But taking its cue from the Brazilian Minister of Finance's private letter ruling, the Tax Court held that the Central Bank received the subsidy "not . . . as an agent of the Brazilian Government, but rather on behalf of the borrowers-to-be," so that it was "proper to treat the Central Bank as separate from the Brazilian Government" for purposes of the subsidy regulation. *Riggs V*, 2004 Tax Ct. Memo LEXIS 110, at *56.

PNC has appealed and now the issue of the subsidy is before us.

## II

PNC's position in this appeal is that the Brazilian government cannot give its Central Bank a subsidy because the two are, for tax purposes, one and the same. The subsidy regulation applicable at the time, Treas. Reg. § 1.901-2(e)(3) (1984),[4] has, functionally, three parts. First, it defines a foreign subsidy as a payment "by any means (such as through a refund or credit)," by the foreign country to the taxpayer or someone engaged in a transaction with the taxpayer, where the payment "is determined, directly or indirectly, by reference to the amount of income tax." Second, it regulates direct subsidies: If a foreign country pays a subsidy directly to a taxpayer, that amount must

[4] In 1986, Congress codified Treas. Reg. § 1.901-2(e)(3), with some changes, at I.R.C. § 901(i), and the IRS followed up with a revised Treas. Reg. § 1.901-2(e)(3). We discuss these changes below.

be subtracted from the taxpayer's foreign tax credit. Third, distinguishing indirect subsidies, it states that "[a] foreign country is considered to provide a subsidy to a taxpayer if the country provides a subsidy to another person that . . . [e]ngages in a transaction with the taxpayer"; here too the subsidy must be subtracted from the credit. The Brazilian government's payments to its Central Bank, calculated by taking 40% of the income tax PNC owed Brazil, fit the definition of a subsidy but clearly are not direct subsidies, as all parties agree. The question is whether those payments qualify as indirect subsidies. PNC claims they do not because "[t]he Central Bank is part of the Brazilian government; indeed, as far as Brazil's finances are concerned, the Central Bank *is* the Brazilian government." Appellant's Reply Br. 1 (emphasis in original). Therefore "the Brazilian government paid the subsidy in question to itself," which, PNC argues, puts the payments outside the indirect subsidy regulation. The sole issue before us is whether, in the circumstances of this case, the Brazilian government's subsidy was paid "to another person" within the meaning of Treasury Regulation § 1.901-2(e)(3).

As a threshold matter, we must determine what it means for the recipient of a subsidy to be "another person": Does this mean a person other than the foreign country, or other than the taxpayer? Read in isolation, § 1.901-2(e)(3), with its careful distinction between direct and indirect subsidies, appears to ask whether the recipient is the *taxpayer*. However, because the indirect subsidy regulation seems on the whole to contemplate a transaction with three parties (foreign government, U.S. taxpayer, and U.S. taxpayer's local partner), the opposite approach—which PNC advocates—is also plausible, especially as it avoids the notion of a government paying a subsidy to itself. As the Commissioner has not opposed PNC's reading, we

shall assume for purposes of this appeal[5] that PNC's § 901 credit should be reduced if and only if the recipient of the subsidy (the Central Bank) is a person other than the Brazilian government.

PNC points to evidence that "the Central Bank is part of the foreign country," Appellant's Reply Br. 6, and hence cannot be "another person." If we faced this question in a vacuum—without the borrowers-to-be arrangement, without the Minister of Finance's private letter ruling, and without the five hearings, appeals, and remands that preceded this appeal—we might well answer it as PNC proposes. There is, after all, no denying the Central Bank's part-to-whole relationship to the Brazilian government. But we do not operate in a vacuum; we are bound by determinations in earlier iterations of this case. PNC's factual argument, however convincing it might be, was properly before the court in *Riggs II*, not here. We cannot ignore the holding in that case and consider the facts *de novo*. *See* K.N. LLEWELLYN, THE BRAMBLE BUSH 29, 35 (Oceana Publications 1981) (1930) (explaining how, depending on legal context or posture, the facts in a case can be far "from the reality of raw events" and "miles away from life").

---

[5] A subsequent change in the law has rendered this analysis academic except as regards legacy cases such as this one. In 1986, Congress codified a rephrased version of Treas. Reg. § 1.901-2(e)(3) at I.R.C. § 901(i). *See* Tax Reform Act of 1986, Pub. L. No. 99-514, § 1204, 100 Stat. 2085, 2532. The new statutory provision eliminated the words "another person," recognizing subsidies delivered directly or indirectly to "any party" to a transaction with the taxpayer. *See also* Denial of Foreign Tax Credits for Government Provided Subsidies, 56 Fed. Reg. 56,007 (Oct. 31, 1991) (similarly eliminating "another person" from the treasury regulation). As the Central Bank was a party to the net loan transaction, the reduction in the § 901 credit would be clear under the current statute.

PNC's proposed outcome would make a virtue of inconsistency, applying disparate treatment to two legs of a simultaneous transaction.  Had the Central Bank handed $10 to the Brazilian government and the Brazilian government handed $5 back—or, even more accurately, had the Central Bank netted the transaction out itself and only handed over $5 in the first place—PNC would have us take legal account of the $10 and ignore the $5 given back.

"Inconsistency is the antithesis of the rule of law." *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc).  Of the various doctrines, principles, and practices we use to police inconsistency, some of which go to the root of what law is, law-of-the-case doctrine is most applicable here:  "[T]he *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result*." *Id.* (emphasis in original); *see also Arizona v. California*, 460 U.S. 605, 618 (1983) ("As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."); *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995) ("When there are multiple appeals taken in the course of a single piece of litigation, law-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court.").  Law-of-the-case doctrine encompasses issues decided both explicitly and "'by necessary implication.'" *LaShawn A.*, 87 F.3d at 1394 (quoting *Crocker*, 49 F.3d at 739).  The identity or non-identity of the Central Bank and the Brazilian government for purposes of the tax arrangement in this case was decided by necessary implication in *Riggs II*.

*Riggs II* was a subtle case.  The issue was whether the Central Bank's payments to the Brazilian government on PNC's behalf should be regarded as voluntary or compulsory in light of

the Foreign Minister's private letter ruling stating that the payments were compulsory. The court applied the act of state doctrine, which in its classic formulation holds that "the courts of one country will not sit in judgment on the acts of the government of another done within its own territory," *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897), and in its modern formulation "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory," *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964). Since *Banco Nacional*, the doctrine has been understood to arise from the separation of powers, reflecting "the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder the conduct of foreign affairs." *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990) (internal quotation marks omitted).

Applying this doctrine to the Minister of Finance's private letter ruling was not straightforward. For one thing, the doctrine is typically applied to tangible acts, like the expropriation of property, rather than the ruling of a government official. *See Riggs II*, 163 F.3d at 1368. For another, applying the doctrine to a foreign official's ruling might run contrary to Federal Rule of Civil Procedure 44.1, directing courts to independently determine issues of foreign law, and its tax law equivalent, U.S. Tax Court Rule 146. In a crucial passage threading these obstacles, the *Riggs II* court reasoned that

> whether or not it can be said that the Brazilian Minister of Finance's interpretation of Brazilian law qualifies as an act of state, the Minister's order to the Central Bank to withhold and pay the income tax on the interest paid to the Bank goes beyond a mere interpretation of law. The Minister, after all, ordered that the Central Bank "must, in substitution of the future not yet identified

> debtors of the tax [*i.e.*, the borrowers-to-be], pay the income tax . . . ." Such an order has been treated as an act of state. The Tax Court's conclusion on Brazilian law—that no tax is imposed on a net loan transaction involving a governmental entity as borrower—implicitly declared "non-compulsory," *i.e.*, invalid, the Minister's order to the Central Bank to pay the taxes. The act of state doctrine requires courts to abstain from even engaging in such an inquiry.

*Id.* (bracketed text in original) (internal citations omitted). Put in the affirmative, the holding here is that American courts must accept as given that the Brazilian government levied a compulsory tax payment on the Central Bank, where the Central Bank stood in for borrowers-to-be. Thus what *Riggs II* resolved by necessary implication was the *status of* or *role played* by the Central Bank with respect to the PNC transaction. That resolves the present appeal, for if the Central Bank stood in for borrowers-to-be when it paid PNC's taxes, it also stood in for them when it received 40% of those tax payments back in subsidies.

PNC tries to avoid this conclusion by arguing that the *Riggs II* court disavowed the borrowers-to-be rationale when it refused to hold that the "Minister of Finance's interpretation of Brazilian law qualifies as an act of state." The act of state at issue in *Riggs II*, as PNC interprets the case, was solely the Minister's order, the bare imperative to the Central Bank to pay taxes. Indeed, as PNC sees it, the act of state doctrine cannot encompass the rationale behind a foreign government's acts. The holding of *Riggs II*, on this argument, would be that American courts must accept as given that the Brazilian government levied a compulsory payment on the Central Bank—period.

But the borrowers-to-be rationale and the Minister's interpretation of Brazilian law are not one and the same, and the court's refusal to call one an act of state in no way implies rejection of the other. The Minister's private letter ruling has three parts: the bare imperative, the borrowers-to-be rationale, and a broader discussion of the Central Bank's legal situation in various types of financial transactions. The last of these is the likely antecedent for *Riggs II*'s reference to an interpretation of Brazilian law—which makes good sense when one notices that the borrowers-to-be rationale is not an interpretation of law at all. Far from rejecting the borrowers-to-be logic, *Riggs II* in fact repeated that rationale—indeed, restated the Minister's order in such a way as to incorporate it—immediately after disclaiming the Minister's interpretation of Brazilian law as an act of state: "[W]hether or not it can be said that the Brazilian Minister of Finance's interpretation of Brazilian law qualifies as an act of state . . . [t]he Minister . . . ordered that the Central Bank must, in substitution of the . . . [borrowers-to-be], pay the income tax . . . ." *Id.* (internal quotation marks omitted).

In concluding that the Central Bank is "another person" in the sense of the treasury regulation, we need not apply the act of state doctrine. Rather, in the interest of consistency, we need only adhere, as a law-of-the-case matter, to the necessary implications of *Riggs II*. There, the court held that, based on the act of state doctrine, American courts had to accept the Minister's determination that the Brazilian government had compelled the Central Bank to remit tax payments on PNC's behalf, *standing in for the borrowers-to-be*. In that role, the Central Bank was distinct from the Brazilian government. Thus, as the payment and the subsidy are both part of the same indivisible transaction, *Riggs II* necessarily implies the Central Bank is likewise distinct for purposes of the subsidy.

Two last points round out this argument. First, law-of-the-case doctrine is prudential; the Supreme Court has instructed that courts may "reopen what has been decided," though they should "as a rule . . . be loath[] to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) (quoting *Messinger v. Anderson*, 225 U.S. 436, 444 (1912))(internal quotation marks omitted), and *Arizona*, 460 U.S. at 618 n.8); *see also LaShawn A.*, 87 F.3d at 1393. PNC has failed to persuade us that there is error or injustice, particularly when every previous court to address the issue has regarded PNC's tax arrangement in Brazil as a stratagem for avoiding U.S. taxes. *See Riggs I*, 1996 U.S. Tax Ct. LEXIS 49, at *41; *Riggs II*, 163 F.3d at 1369; *Riggs III*, 2001 Tax Ct. Memo LEXIS 20, at *64–66.

Second, the root principles at work here—the principle that courts must be consistent with one another and the principle that governmental entities may in some circumstances be treated as private when taking on a private role or function—have a venerable lineage. *See Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611, 614 (1992) (putting a distinction between a government's exercises of uniquely sovereign power and ordinary private power at the heart of foreign sovereign immunity); *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695 (1976) (plurality opinion) (recognizing a traditional distinction "between the public and governmental acts of sovereign states on the one hand and their private and commercial acts on the other"); *Bank of the U.S. v. Planters' Bank of Ga.*, 22 U.S. (9 Wheat) 904, 907 (1824) (Marshall, C.J.) ("[W]hen a government becomes a partner in any trading company, it devests itself, so far as concerns the transactions of that company, of its sovereign character, and takes that of a private citizen."); Henry J. Friendly, *Indiscretion About Discre-*

18

*tion*, 31 EMORY L.J. 747, 758 (1982) ("[T]he most basic principle of jurisprudence [is] that we must act alike in all cases of like nature." (internal quotation marks omitted)).

III

In place of the analysis above, PNC asks us to follow the Seventh Circuit's approach from *Amoco Corp. v. Commissioner*, 138 F.3d 1139 (7th Cir. 1998). But as described below, *Amoco* shares none of the factual circumstances we find dispositive here, for which reason we decline to follow it in the instant case.

Virtually every page of PNC's briefs is studded with references to *Amoco*, which involved the tax consequences of a complicated oil exploration arrangement between Amoco, a U.S. oil company operating in Egypt, and the Egyptian General Petroleum Corporation, an entity owned and controlled by the Egyptian government for the purpose of managing Egypt's oil wealth. EGPC contracted to pay Amoco's Egyptian income tax on Amoco's behalf—as in a net loan arrangement—and then took a credit on its own Egyptian taxes exactly equal to what it paid for Amoco. (EGPC had no tax immunity and ordinarily paid income taxes as if a commercial entity.) The question for the Seventh Circuit was whether Amoco should be permitted a foreign tax credit on its U.S. taxes under § 901, or whether the credit EGPC took in Egypt should, under the same subsidy regulation at issue in our case, count as an indirect subsidy, reducing Amoco's U.S. credit to zero. The Tax Court had found no indirect subsidy because "EGPC was part of the Egyptian government, and thus by definition it was incapable of receiving a subsidy from itself." *Id.* at 1146. The Seventh Circuit affirmed, but on somewhat more modest reasoning. Finding "[t]he question of how to treat state-owned enterprises . . . exceedingly complicated," the court favored a "functional approach" over "bright-line rules" and refused to decide

"whether it is impossible in all circumstances for a government to grant a subsidy to one of its wholly or majority owned enterprises." *Id.* at 1146–47. In Amoco's case, the court found no indirect subsidy for two reasons: first was EGPC's economic identity with the Egyptian government ("EGPC's profits go straight to the treasury, and it would never feel any losses, because the treasury would absorb them."), and second was the fact that, as an economic matter, EGPC alone received the benefit of the credit while "Amoco unquestionably bore the economic burden of the taxes imposed on its operations by Egypt." *Id.* at 1148–49.

PNC argues that its situation is identical to the one in *Amoco*: It too contracted with a foreign governmental entity that agreed to pay its American partner's local taxes, received some of the tax money back, and shares an economic identity with the foreign government. Thus it too should benefit from the idea that, as PNC characterizes *Amoco*'s holding, "when the benefit of the subsidy is provided to the foreign government, there is no subsidy within the meaning of the regulations since it is impossible for the foreign government to subsidize itself." Appellant's Br. 21.

But to start with, that isn't *Amoco*'s holding—or rather, it is only half of *Amoco*'s holding. The other half is the economic analysis concluding that the U.S. taxpayer bore all the burden of the foreign tax and received no benefit from the foreign credit—whereas in our case, the tax Brazil formally levied on its Central Bank represented only a benefit to PNC. Even more importantly, *Amoco* lacked every factual feature we have found decisive in this appeal: no tax immunity, no private letter ruling or equivalent, no borrowers-to-be or analogue for them, and no controlling precedent. Unless we ignore the facts and the history of this case, we are bound to regard the Central Bank as standing in for private parties. Indeed, PNC's comparisons

between the Central Bank in this case and EGPC in *Amoco* are premature: Logically prior to any such comparison—indeed the first analytic step in many cases that turn on someone's or something's governmental status—is fixing on the role that person or entity played in the particular circumstances of the case. The Seventh Circuit itself said as much ("[T]he kind of legal issue presented and the context of the suit has been more important than the label 'governmental' or 'non-governmental,'" *Amoco Corp.*, 138 F.3d at 1147) and was careful to cabin its conclusions accordingly.

## IV

Both PNC and the dissent would have us answer the question of the Central Bank's status as if indifferent to all context and background. This we cannot do. As we agree with the Tax Court that, under the facts of this case, it is "proper to treat the Central Bank as separate from the Brazilian government" and deem the bank "another person" within the meaning of the subsidy regulation, the judgment of the Tax Court is

*Affirmed.*

1

GRIFFITH, *Circuit Judge*, dissenting:

I share the majority's frustration with this, the latest of what seems to have become a judicial mini-series, "Riggs VI: Return of the Subsidy." We are unanimous in the hope that it is the last of the sequels. We disagree, however, about what our role in this case should be, and I think it a disagreement worthy of some discussion. While I share my colleagues' unease over PNC's "stratagem for avoiding U.S. taxes," Op. at 17, such discomfort alone cannot determine the outcome of a case. Both facts and law are fundamental to our conclusions, and although the facts of this case are complicated, the law is simple. This case turns entirely on the plain language of controlling U.S. tax regulations. That language is clear, unambiguous, and dispositive. Its effects—whatever they may be—are not within our power to forestall, and its neutral application does not, as the majority suggests, create any inconsistency. On the contrary, our abandonment of a textual approach creates inconsistencies galore, putting us conspicuously at odds with the text of both U.S. and relevant Brazilian law, our own precedent, and the reasoned decision of a sister circuit. The court's analysis also obscures two important principles it seeks to clarify: the act of state doctrine and the law-of-the-case doctrine. Accordingly, I dissent.

I.

The text of controlling law requires our disposition in favor of PNC. We are reluctant to disregard an agency's interpretation of its own regulation "unless an alternative reading is compelled by the regulation's plain language . . . ." *Air Transp. Ass'n of Am., Inc. v. F.A.A.*, 291 F.3d 49, 53 (D.C. Cir. 2002) (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)) (internal quotation marks omitted). In this case, the plain language of the relevant Treasury regulation is

sufficient to compel an alternative reading. The question for the court is whether foreign tax credits properly claimed by PNC should be reduced by the amount of subsidy payments made by the Brazilian government to the Central Bank of Brazil. *See Riggs Nat'l Corp. & Subsidiaries v. Comm'r*, 295 F.3d 16, 22-23 (D.C. Cir. 2002) (*Riggs IV*) (remanding this issue to the Tax Court). The controlling provision of law is Treas. Reg. § 1.901-2(e)(3)(ii) (1984),[1] which provides in relevant part that a payment constitutes a "subsidy" only if it is paid by a "foreign country" to "another person." The resolution of this appeal thus depends on whether the Brazilian government (a "foreign country") has made payments to "another person" within the meaning of Treas. Reg. § 1.901-2(e)(3)(ii). Our sole task is to determine whether the Central Bank is "another person" for the purpose of the relevant regulation. *See* Op. at 11.

Given the ample amount of judicial ink put to paper concerning the relationship between and among Riggs Bank, the Central Bank of Brazil, and the government of Brazil, our analysis need not be labored. It is uncontested, as the court observes, that the Central Bank is "100% a part of Brazil's federal government," *id.* at 5, "government-controlled," *id.* at 3, and "required [by Brazilian law] to act on behalf of Brazil's government and prohibited from acting on behalf of anyone else," *id.* at 5. And yet the court simultaneously contends that the Brazilian government and the Central Bank of Brazil are "distinct," *see id.* at 16, and concludes that the Central Bank "stood in for [borrowers-to-be] when it received . . . tax payments back in subsidies," *id.* at 14. I disagree. The answer to the question before us is apparent: The Central Bank is unquestionably part of a "foreign country" and therefore not

---

[1] "A foreign country is considered to provide a subsidy to a taxpayer if the country provides a subsidy to another person that . . . [e]ngages in a transaction with the taxpayer." Treas. Reg. § 1.901-2(e)(3)(ii).

"another person." No one disputes that Riggs's taxes have been retained by the Brazilian government. The functional transfer of funds within a government is not a transfer to "another person." The regulations confirm this conclusion by clarifying that when a subsidy is paid to a "political subdivision" of a foreign state issuing the subsidy, the subsidy is paid to the "foreign country" itself. Treas. Reg. § 1.901-2(g)(2). I fail to see ambiguity in this text that would permit any alternative conclusion.

Even my colleagues agree that, "in a vacuum," our disposition ought to be self-evident. *See* Op. at 12 ("[W]e might well answer [the question] as PNC proposes. There is, after all, no denying the Central Bank's part-to-whole relationship to the Brazilian government."). But the court, perhaps frustrated by the outcome that this straightforward analysis of the text and neutral application of law requires,[2] struggles to justify the opposite result. Observing that "we do not operate in a vacuum," *id.* at 12, the court concludes that a decision in favor of PNC would ratify an intolerable inconsistency, *see id.* at 13. Again, I disagree. On the contrary, the court, in trying to restore clarity to the confusing legal interpretation of a foreign minister (and, perhaps, in its attempt to reach what it deems a just end to a troubling case), has contorted what precious little logic remains available to us and, in so doing, has overstepped the limits of its authority.

---

[2] "[E]very previous court to address [this] issue has regarded PNC's tax arrangement in Brazil as a stratagem for avoiding U.S. taxes." Op. at 17. Although I am sympathetic to the court's reluctance to tolerate what it senses to be unfair play, we do not referee fairness. We construe law. As Thomas More observed in *A Man for All Seasons*, "I know what's legal not what's right. And I'll stick to what's legal." ROBERT BOLT, A MAN FOR ALL SEASONS 65 (Vintage International Ed. 1990).

4

II.

The majority's error flows from its mistaken effort to impose consistency on the reasoning of a foreign state—specifically, the dubious conclusion that the Central Bank stood in for borrowers-to-be when it paid PNC's taxes, *see id.* at 15. From my colleagues' perspective, it is not possible to conclude that the Central Bank was compelled to pay taxes to the government of Brazil without *also* concluding that the Central Bank acted in the place of borrowers-to-be and is, therefore, "another person" for the purpose of our tax law. The majority observes that "[when it was compelled to] remit tax payments on PNC's behalf, *standing in for the borrowers-to-be* . . . the Central Bank was distinct from the Brazilian government. Thus, as the payment and the subsidy are both part of the same indivisible transaction, *Riggs II* necessarily implies the Central Bank is likewise distinct for purposes of the subsidy." *Id.* at 16 (emphasis in original). But in fact we specifically held otherwise in *Riggs National Corp. & Subsidiaries v. Commissioner*, 163 F.3d 1363 (D.C. Cir. 1999) (*Riggs II*), declining to conclude that the Central Bank of Brazil was distinct from the government of Brazil, much less that it acted in the place of borrowers-to-be. Such a conclusion would not have been supported by law, nor by logic. As the court itself notes, the Central Bank is "required to act on behalf of Brazil's government and prohibited from acting on behalf of anyone else." Op. at 5.

Ironically, my colleagues' disregard for the logical flaws in the Minister's reasoning is animated by their desire to circumvent what they misconceive to be another logical problem: how this court, in *Riggs II*, could have deferred to a conclusion if that conclusion were based on a false premise. In other words, how could we have deferred to an act of state (*i.e.*, the order that the Central Bank pay taxes on PNC's income)

without having accepted, "by necessary implication," *see* Op. at 13, 15-16, the reasoning offered to justify the state act (*i.e.*, that the Central Bank stood in for borrowers-to-be)? But this is no logical problem at all. We deferred to the act because the act of state doctrine compelled us, *regardless of the underlying premise*. That is the purpose of the doctrine, which precludes us from "inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory," *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964), and the nature of deference, which precludes us from "sit[ting] in judgment on the acts of the government of another done within its own territory," *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). The fact that the Minister of Finance "looked through" the Central Bank for the purposes of deciding the proper tax treatment of loans, *see Riggs II*, 163 F.3d at 1366, does not require that we base our own conclusions on the result of that awkward analysis. Had the Minister of Finance based an order on his observation that the sky is orange, we would still defer to the order, regardless of the reasoning. No implications, therefore, "necessary" or otherwise, fell out of our decision that the Central Bank paid taxes on behalf of PNC other than the fact that PNC could claim foreign tax credits in the amount of those taxes.

I agree that "in the interest of consistency, we need [to] adhere . . . to the necessary implications of *Riggs II*." Op. at 16. But that is not what the court has done. Instead—and contrary to its own representation ("We cannot ignore the holding in [a previous case] and consider the facts *de novo*." Op. at 12)—the court has adopted, de novo, the interpretation of a foreign official that contravenes the text of foreign law (an observation that both the Commissioner and the tax court have shared). ("[T]he Central Bank, under Brazilian law, was constitutionally immune from having to pay withholding tax with respect to its net loan interest remittances abroad." *Riggs Nat'l Corp. v.*

*Comm'r*, 107 T.C. 301,  355 (1996) (*Riggs I*), *rev'd on other grounds, Riggs II*, 163 F.3d 1363.) This is precisely the error we avoided in our previous holding. ("We are . . . hesitant to treat an interpretation of law as an act of state, for such a view might be in tension with rules of procedure directing U.S. courts to conduct a *de novo* review of foreign law when an issue of foreign law is raised. *See* FED. R. CIV. P. 44.1; TAX COURT R. 146." *Riggs II*, 163 F.3d at 1368.) The act of state doctrine did not compel our deference to the *legal interpretation* of a foreign state and therefore offers no support for the majority's conclusion. Nor does our holding in *Riggs II* bolster the court's conclusion that we are bound by the law of this case to abandon our unanimous plain language interpretation of controlling law. Nor has the court offered any analysis to support its novel conclusion that the Central Bank should be considered to have acted on behalf of borrowers-to-be despite the explicit prohibition against acting on behalf of anyone but the government of Brazil. *See* Op. at 5. In fact, the majority admits to being puzzled (as am I) by how, even "if it were legally possible for the Brazilian government to impose a tax on its Central Bank . . . it would be economically possible for the Central Bank to pay it: At most, the money would go from the Brazilian government's right pocket to its left." *Id*. Precisely.  It is similarly puzzling to suppose that when the Brazilian government pays subsidies to the Central Bank, it is doing anything more than the same motion in reverse. Why then are these two halves of the same transaction, occurring simultaneously, treated differently?  Because an act of state compelled us to recognize the first half (*i.e.*, mandatory payment of tax) while no such act compels our recognition of the second half (*i.e.*, payment of subsidy). Whereas we were obliged in *Riggs II* to accept the fact that the Central Bank had been compelled to pay taxes (despite all evidence to the contrary), we were not (nor are we now) obliged to accept the argument that the Central Bank stood in the place of borrowers-to-be and is

therefore "another person" for the purpose of our tax law. It was our required deference in one case, not required in another, that accounts for our "disparate treatment to two legs of a simultaneous transaction," *see id*. at 13, which, frustrating though it may be to those who dislike the outcome, is not at all *inconsistent*.

## III.

Far from being "indifferent to all context and background" in this case, Op. at 20, I am mindful of our duty to respect the effect of our previous holdings and the bounds of our role in this case. I also share my colleagues' interest in policing inconsistency in our jurisprudence, *see id*. at 13, and therefore find myself motivated by the same concerns expressed by the court, but reach the opposite conclusion. I believe that the court's analysis has ignored conclusive authority, created inconsistencies where none need exist, and ultimately put us at odds with (1) the plain language of U.S. law, (2) our own precedent in this case, and (3) the reasoned analysis of a sister circuit.

First, the court's decision ignores the language of the controlling U.S. tax regulation. The plain meaning of "another person" is clear, despite the majority's initial interpretation of that dispositive phrase. *See id*. at 11 ("Read in isolation, § 1.901-2(e)(3) . . . appears to ask whether the recipient is the *taxpayer*." (emphasis in original)). The words "another person" are most naturally read—both in isolation and in the relevant context—to mean a third party that is neither the foreign government nor the U.S. taxpayer. Thankfully, this is not a source of disagreement, as the majority ultimately concludes that "for purposes of this appeal . . . [another person] is a person other than the Brazilian government," and "[t]here is, after all,

no denying the Central Bank's part-to-whole relationship to the Brazilian government." Op. at 12.

A textual approach to the case would therefore seem appealing, not only because of the clarity it offers, but also because the relevant regulations did not, at the time of their effect in this case, permit a functional analysis of whether the "subdivision" of a "foreign country" was in fact part of the foreign country. Instead, the Internal Revenue Service created a bright-line rule to govern the categorization of indirect subsidies. That rule, as our sister circuit has noted, was intended to save the Service from the "interminable investigation of the mysteries of public finance." *See Cont'l Ill. Corp. v. Comm'r*, 998 F.2d 513, 520 (7th Cir. 1993) (Posner, J.). If an alternative mechanism were preferable, it was for the Service to create, not for us to impose. There is nothing in the regulations to support the view that a "subdivision" of a "foreign state" can be part of the "foreign country" in some cases but not others. Indeed, the regulations state the contrary, defining "foreign country" as "any foreign state . . . and any political subdivision of any foreign state . . . ." Treas. Reg. § 1.901-2(g)(2); *see also Amoco Corp. v. Comm'r*, 138 F.3d 1139, 1147 (7th Cir. 1998).

The decision of this court is therefore at odds with the plain language of relevant law, creating a troubling inconsistency between our jurisprudence and the controlling text of a regulation. If the Commissioner is frustrated by a loophole that exists in the agency's regulations, he need only correct it or request that Congress amend the statute.[3] We may not enforce

---

[3] Indeed, it would appear that the loophole that gave rise to Riggs's petition in this case has been appropriately remedied by Congress. The current regulations, revised in 1991, eliminate the phrase "another person" and provide that an amount is a subsidy if it is provided "*to any person* (governmental or not)." Treasury Decision 8372, 1991-2 C.B. 338 (emphasis added); *see also* Op. at 12 n.5.

such corrections retroactively. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law. Thus . . . a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.").

Second, the court's analysis is inconsistent with our own precedent in this case. The majority asserts that we are bound by the law-of-the-case doctrine ("[T]he *same* issue presented a second time in the *same case* in the *same court* should lead to the *same result.*" Op. at 13 (quoting *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) (emphasis in original))) and that "[t]he identity or non-identity of the Central Bank and the Brazilian government for purposes of the tax arrangement in this case was decided by necessary implication in *Riggs II*." Op. at 13. I disagree and believe that the majority has misinterpreted our decision in *Riggs II*, which was specifically and explicitly limited to address whether or not the Central Bank had been compelled to pay taxes on Riggs's income. The *issue* in that case was whether Riggs was "legally liable for the tax under Brazilian law." *Riggs II*, 163 F.3d at 1363 (internal quotation marks omitted). The *result* in that case was that the Minister's order to the Central Bank to make tax payments on behalf of Riggs was presumptively valid, *see id.* at 1368; *Riggs IV*, 295 F.3d at 18, or as the majority puts it, "American courts must accept as given that the Brazilian government levied a compulsory payment on the Central Bank—period." Op. at 15. That is the extent of the result in that case. The law-of-the-case doctrine compels our deference only to that previous judicial conclusion, and not to the incongruous legal interpretations of a foreign state that we have previously disavowed. *See Riggs II*, 163 F.3d at 1368 (declining to apply the act of state doctrine to a foreign state's interpretation of law in light of our obligation to interpret law de novo).

In support of its law-of-the-case argument, the court suggests that *Riggs II* can be read to include the Minister's "borrowers-to-be" rationale as part of its holding because it "restated the Minister's order in such a way as to incorporate [its rationale . . . ." Op at 16. It then quotes *Riggs II* as evidence of its theory: "[T]he Minister . . . ordered that the Central Bank must, in substitution of the . . . [borrowers-to-be], pay the income tax . . . ." *Id.* (internal quotation marks omitted) (citing *Riggs II*, 167 F.3d at 1368). But the original language of *Riggs II* is as follows:

> [W]hether or not it can be said that the Brazilian Minister of Finance's interpretation of Brazilian law qualifies as an act of state, the Minister's order to the Central Bank to withhold and pay the income tax on the interest paid to the Bank goes beyond a mere interpretation of law. The Minister, after all, ordered that the Central Bank "*must, in substitution of the future not yet identified debtors of the tax . . . pay the income tax on the interest paid during the period in which the funds remained available for relending.*" *Riggs*, 107 T.C. at 331. Such an order has been treated as an act of state.

*Riggs II*, 163 F.3d at 1368 (emphasis added). The language we quoted in *Riggs II* was not even the Minister's language. It was excerpted from the Opinion of the Acting Secretary of the Brazilian tax authority, upon which the Minister based his order. In fact, the actual language of the Minister's order was much more concise:

> I agree fully with the conclusions of the attached opinion of the . . . [Brazilian IRS]. In view of item 13 of said opinion, I direct the Central Bank of Brazil to

> implement the payment of income tax on or before the last business day of the month following the month in which the withholding is made.

*Riggs I,* 107 T.C. at 329. Our decision in *Riggs II* to quote language from the opinion upon which the Minister's order was based does not imply, much less demonstrate, that our deference in that case extended to the reasoning behind the act of state. The court errs when it fixes its attention on the contents of a state authority's *legal opinion*, *see* Op. at 16 ("[The foreign ruling] has three parts: the bare imperative, the borrowers-to-be-rationale, and a broader discussion of the Central Bank's legal situation in various types of financial transactions."), rather than the state's act ("I direct the Central Bank of Brazil to implement . . . payment . . . ." *Riggs I*, 107 T.C. at 330 (internal quotation marks omitted)). The act of state has only one part: the official demand of payment. Particularly in light of our own language in *Riggs II* describing the Minister's order "to withhold and pay the income tax on the interest paid," *id.* at 1368, as well as the surrounding discussion, which I read to be contemplative of the very scenario now before us, I cannot agree with the majority that we ever intended to include the borrowers-to-be reasoning in our understanding of what the act of state included. Our language in *Riggs IV* further confirms my view when it describes our holding in *Riggs II*, in which "we held that *the Minister of Finance's ruling that the Central Bank was obligated to pay the taxes was an act of state*, which precluded the Commissioner from inquiring into its validity." *Riggs IV,* 295 F.3d at 18 (emphasis added).

The court's conclusion that the Central Bank's role (*i.e.*, "standing in for the borrowers-to-be," Op. at 16) is defined by the "necessary implication" of our previous limited holding is therefore unsupported and the majority now rests its entire decision on the faulty reasoning we have hitherto disclaimed. In

so doing, the court turns the Tax Court's error in *Riggs I* on its head. In *Riggs I*, the Tax Court ignored the Minister's ruling and instead conducted its own investigation of Brazilian tax law. We corrected the error by clarifying that a U.S. court may not invalidate a foreign sovereign's official act within its own territory. The tax court had not been appropriately deferential. The approach advocated today by the majority goes too far in the opposite direction by requiring our deference not only to a sovereign's official act, but also to the underlying reasoning. This is a misapplication of the act of state doctrine, which is meant to prevent the courts of one sovereign from examining the validity of the acts of another because doing so "would very certainly imperil the amicable relations between governments and vex the peace of nations." *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 304 (1918) (internal quotation marks omitted). As the Court made clear in *Underhill v. Hernandez*, "[r]edress of grievances by reason of [acts of state] must be obtained through the means open to be availed of by sovereign powers as between themselves." 168 U.S. at 252. Just as the appropriate audience for frustration at the controlling language of the Treasury regulations is Congress and the Internal Revenue Service, the appropriate audience for frustration at Brazil's order is the Executive.

Third, and finally, the majority's analysis is inconsistent with the decision of our sister circuit, and therefore creates a split from the Seventh Circuit's determination in *Amoco*. In that case, both the Tax Court and the Seventh Circuit held that a government entity could not receive a subsidy from that same government. *See Amoco*, 138 F.3d at 1146 (citing Tax Court's interpretation of Treas. Reg. § 1.901-2(e)(3)(ii), "which indicates that indirect subsidies to the U.S. taxpayer occur when a foreign nation provides a subsidy to *another* person" (emphasis in original)). The *Amoco* court based its conclusion on the seemingly uncontroversial observation that it is impossible for a

foreign government to subsidize itself. *See id.* at 1148-49. Although we are not bound by the Seventh Circuit's holding, "we avoid creating circuit splits when possible." *United States v. Philip Morris USA Inc.*, 396 F.3d 1190, 1201 (D.C. Cir. 2005). This may be particularly true in a case involving federal tax law, where "uniformity among the circuits is particularly desirable . . . to ensure equal application of the tax system," *Wash. Energy Co. v. United States*, 94 F.3d 1557, 1561 (Fed. Cir. 1996) (internal quotation marks omitted), and to further maintain consistency.

Of greater concern than our departure from the views of a sister circuit in a similar case, however, is our departure from the logic that undergirds both *Amoco* and the case before us. Key to the *Amoco* court's analysis of whether a subsidy was paid to "another person" was whether the "benefit" of the subsidy was retained by the foreign government that had paid it. *See Amoco*, 138 F.3d at 1148-49; *see also Riggs Nat'l Corp. & Subsidiaries v. Comm'r*, No. 24368-89, slip op. at 38 n.12 (T.C. May 3, 2004) (recognizing the necessity of a benefit analysis in determining whether a subsidy is an "indirect subsidy" for the purposes of the Treasury regulations).[4] If the benefit of the subsidy is retained by the foreign government, then it should not be treated as a subsidy for the purpose of the Treasury regulations.

My colleagues acknowledge that the purpose of the subsidy provision in U.S. tax law is to avoid double taxation. *See* Op. at 2. They fail to demonstrate, however, how a decision in favor of PNC would offend this purpose. They claim that "[t]he IRS ends up on the wrong end of the see-saw." *Id*. at 6. But whether or not the IRS ends up on the wrong end of the see-saw

---

[4] Although I have noted that a functional approach to the relevant regulatory language is disfavored in this case, the fact that the court's analysis contravenes *both* textual *and* functional approaches bears notice.

is not our concern. We have no authority over that playground. It is undisputed that the Central Bank received *and retained* the benefit of the subsidy. The majority has failed to cite any record evidence to the contrary. If the benefit of the subsidy paid by Brazil is retained by Brazil, then it should not be treated as a subsidy for the purposes of the Treasury regulations. *See, e.g.*, *Amoco*, 138 F.3d at 1148.

The court distinguishes *Amoco* by listing factual differences between the cases. *See* Op. at 19 ("*Amoco* lacked every factual feature we have found decisive in this appeal: no tax immunity, no private letter ruling or equivalent, no borrowers-to-be or analogue for them, and no controlling precedent."). None of these features compels a different decision. If anything, they strengthen the case for PNC. The Central Bank's tax immunity demonstrates its economic identity with the government of Brazil—a characteristic that weighs strongly in favor of PNC. The private letter ruling explains why in *Riggs II* we allowed PNC to claim foreign tax credits—a determination that would otherwise seem surprising at best. The borrowers-to-be are irrelevant to the analysis favored by the *Amoco* court, as no borrowers-to-be retained the benefit of subsidies. And, as I have discussed, our precedent in this case does not compel our endorsement of the suspicious rationale put forth by the Minister of Finance—indeed, it counsels our reluctance to adopt that reasoning.

## IV.

Our previous holdings in this line of cases allowed Brazil to place an artificial tax liability on its own Central Bank and thus exploit a domestic tax loophole for the benefit of Riggs Bank. Regretful about the consequences of our holding, we nonetheless recognized that the remedy sought by the Commissioner was not ours to provide: "Of course, the

opportunistic nature of the Brazilian government's action is particularly vexing. . . . But although we can visualize prophylactic regulatory measures . . . the Commissioner has not yet fashioned a legitimate legal challenge to Riggs's use of the foreign tax credit in this case." *Riggs II*, 163 F.3d at 1369. PNC's attempt to take advantage of the Treasury regulations by virtue of our previous decision is similarly vexing. And similarly, although we can easily visualize prophylactic regulatory measures (which have in fact since been implemented), the Commissioner has again failed to request relief that *a court* can provide. If an act of state is objectionable, it is for the Executive to contest. If laws are flawed, they are for Congress to improve.

I respectfully dissent.